**UNITED STATES v. GRIFFITH AMUSE-MENT CO. et al.**

Civ. No. 172.

United States District Court
W. D. Oklahoma.

Dec. 27, 1950.

George W. Wise and Milton A. Kallis, Assts. to Atty. Gen. (Herbert A. Bergson, Asst. Atty. Gen., and Robert E. Shelton, U.S. Atty., Oklahoma City, Okl. on brief), for plaintiff.

C. B. Cochran and J. B. Dudley, Oklahoma City, Okl., for defendants.

VAUGHT, Chief Judge.

The complaint was filed April 28, 1939 and named as defendants: Griffith Amusement Company, Consolidated Theatres, Inc., R. E. Griffith Theatres Inc., Westex Theatres Inc., L. C. Griffith, H. J. Griffith and R. E. Griffith, together with eight major distributors as follows: Paramount Pictures, Inc., Metro-Goldwyn-Mayer Distributing Corporation (Loew's Inc.), RKO Radio Pictures, Inc., Vitagraph, Inc., Universal Film Exchanges, Inc., Twentieth Century-Fox United Artists Corporation and Columbia Pictures Corporation. The complaint alleged:

That Griffith Amusement Company, hereinafter referred to as Amusement, operated one or more picture theatres in each of the towns of Ada, Ardmore, Bartlesville, Blackwell, Bristow, Chandler, Duncan, Elk City, Enid, Fairfax, Guthrie, Henryetta, Hobart, Hugo, Maud, Norman, Okmulgee, Seminole, Shawnee, Stillwater, and Tonkawa in the state of Oklahoma, and in each of the towns of Borger, Gainesville, Kermit, Pampa, Wellington and Wink in the state of Texas;

That Consolidated Theatres, Inc., hereinafter referred to as Consolidated, operated one or more theatres in each of the towns of Altus, Chickasha, Claremore, Clinton, Cushing, Drumright, Holdenville, Hominy, Kingfisher, Mangum, Pauls Valley, Sapulpa, Sayre, and Vinita in the state of Oklahoma, and in each of the towns of Cleburne, Goldsmith, Lubbock, Midland and Sunray in the state of Texas;

That R. E. Griffith Theatres, Inc., hereinafter referred to as Griffith, operated one or more theatres in each of the towns of Alamogordo, Carlsbad, Clovis, Deming, Eunice, Gallup, Hobbs, Jal and Roswell, in the state of New Mexico, and in each of the towns of Olney and Post in the state of Texas;

That Westex Theatres, Inc., hereinafter referred to as Westex, operated one or more theatres in each of the towns of Ballinger, Belton, Burkburnett, Brady, Clarksville, Decatur, Georgetown, Gonzales, Hereford, Lampasas, Lockhart, Luling, Merkel, Odessa, Plainview, San Saba, Spur, Stamford and Winters in the state of Texas and two theatres in the town of Portales in the state of New Mexico;

That L. C. Griffith was president and director of Amusement and president and director of Consolidated, both of whose offices were in Oklahoma City, Oklahoma;

That H. J. Griffith was secretary and director of Amusement, assistant secretary-treasurer and director of Consolidated, and resided in Oklahoma City, Oklahoma;

That R. E. Griffith was assistant secretary and director of Amusement, assistant secretary of Consolidated, president and director of Griffith, president and director of Westex, and resided in Dallas, Texas;

That for the five-year period immediately preceding April 28, 1939, the defendant exhibitors above-named continuously combined with each other and with the defendant distributors to unreasonably restrain interstate trade and commerce in motion picture films and to monopolize and attempt to monopolize the first and second run exhibition of feature pictures and the operation of first and second run theatres in the Griffith towns in violation of sections 1 and 2 of the Sherman Act, 15 U.S. C.A. §§ 1, 2.

That said violations consisted of the following acts: (1) that said exhibitors refrained from competing with each other in the acquisition and operation of motion picture theatres in said towns pursuant to express or implied agreements to allocate said territory between them; (2) that during said five-year period, said exhibitors contracted with each of the defendant dis-

tributors for all of the feature pictures annually required for exhibition at all of the theatres operated by them in said towns, in advance of the production and distribution of such feature pictures and before such feature pictures or any of them had been offered to any other exhibitor in said towns, with the purpose and effect of controlling and monopolizing the supply of feature pictures available for exhibition in said towns; (3) that by said contracts said exhibitors combined with each other to compel each of the defendant distributors to grant to all of them in all of said towns exclusive privileges during the entire time they operated theatres in said towns; (4) that the exclusive privileges above named enabled the defendant exhibitors to unreasonably restrain, suppress and entirely eliminate the competition offered by other theatre operators in the licensing and exhibiting of feature pictures; (5) that during the past five years said distributors uniformly granted to each of the defendant exhibitors, in each town where they operate theatres, the same clearance on all feature pictures released by any of said distributors, by means of uniform action; (6) that each defendant exhibitor had what is commonly referred to in the motion picture industry as a circuit of theatres, and as a result of the acquisition and operation of numerous theatres as hereinbefore alleged, said exhibitors and each of them obtained what is commonly referred to in the motion picture industry as circuit buying power.

The complaint then prayed for specific relief in that the defendant exhibitors be perpetually enjoined and restrained from jointly or collectively negotiating any contracts for the licensing of feature pictures with any of the defendant distributors or their successors in interest, and for further relief.

The defendants filed their answers in July and August, 1940 and the issues were joined. These answers were filed only after numerous motions had been made for bills of particulars, more definite statements, et cetera, and certain portions of the complaint were either withdrawn or stricken. The cause was not tried until the summer of 1945. All of the continuances, however, were at the request of the government based upon the fact that many of the government attorneys in the Department of Justice were engaged in war activities, and it may be said that the continuances were due to war conditions which made it impractical to try the case at an earlier date. The case was tried from May 7 to May 24, 1945 and from September 10 to October 2, 1945, covering thirty actual trial days, or six weeks. Evidence was introduced relating to 243 theatres in 93 towns. In that trial there were 3668 pages of typewritten record and 761 exhibits were introduced, numbering 2873 pages. This court rendered its opinion on October 9, 1946, reported at 68 F.Supp. 180, to which reference is made for a more full and complete statement of the actual issues in this case. The case was appealed to the Supreme Court of the United States, and on May 3, 1948 that court rendered its opinion. United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 942, 92 L.Ed. 1236.

An examination of the opinion of the Supreme Court becomes necessary at this point. Quoting in part:

"This is a suit brought by the United States in the District Court to prevent and restrain appellees from violating §§ 1 and 2 of the Sherman Act.

\* \* \* \* \* \*

"\* \* \* In April, 1939, when the complaint was filed, the corporate appellees had interests in theatres in 85 towns. In 32 of those towns there were competing theatres. Fifty-three of the towns (62 per cent) were closed towns, i.e. towns in which there were no competing theatres. Five years earlier the corporate appellees had theatres in approximately 37 towns, 18 of which were competitive and 19 of which (51 per cent) were closed. *It was during that five-year period that the acts and practices occurred which, according to the allegations of the complaint, constitute violations of §§ 1 and 2 of the Sherman Act.*" (Emphasis supplied.)

The opinion further states that there were certain exclusive privileges alleged to have been granted to the exhibitors over their competitors and that "The exclusive

privileges charged as violations were preemption in the selection of films and the receipt of clearances over competing theatres. It (the complaint) also charged that the use of the buying power of the entire circuit in acquiring those exclusive privileges violated the Act." Quoting further from the opinion:

" * * * And so, even if we accept the District Court's findings that appellees had no intent or purpose unreasonably to restrain trade or to monopolize, we are left with the question whether a necessary and direct result of the master agreements was the restraining or monopolizing of trade within the meaning of the Sherman Act.

"Anyone who owns and operates the single theatre in a town, or who acquires the exclusive right to exhibit a film, has a monopoly in the popular sense. But he usually does not violate § 2 of the Sherman Act unless he has acquired or maintained his strategic position, or sought to expand his monopoly, or expanded it by means of those restraints of trade which are cognizable under § 1. For those things which are condemned by § 2 are in large measure merely the end products of conduct which violates § 1. * * * So it is that monopoly power, whether lawfully or unlawfully acquired, may itself constitute an evil and stand condemned under § 2 even though it remains unexercised. * * * It follows a fortiori that the use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor, is unlawful.

" * * * When the buying power of the entire circuit is used to negotiate films for his competitive as well as his closed towns, he is using monopoly power to expand his empire. * * *

* * * * * *

"Appellees were concededly using their circuit buying power to obtain films. Their closed towns were linked with their competitive towns. * * * Monopoly rights in the form of certain exclusive privileges were bargained for and obtained. These exclusive privileges, being acquired by the use of monopoly power, were unlawfully acquired. The appellees, having combined with each other and with the distributors to obtain those monopoly rights, formed a conspiracy in violation of §§ 1 and 2 of the Act. * * *

"What effect these practices actually had on the competitors of appellee exhibitors or on the growth of the Griffith circuit we do not know. The District Court, having started with the assumption that the use of circuit buying power was wholly lawful, naturally attributed no evil to it and thus treated the master agreements as legitimate weapons of competition. Since it found that no competitors were driven out of business, or acquired by appellees, or impeded in their business by threats or coercion, it concluded that appellees had not violated the Sherman Act in any of the ways charged in the complaint. These findings are plainly inadequate if we start, as we must, from the premise that the circuit buying power was unlawfully employed. On the record as we read it, it cannot be doubted that the monopoly power of appellees had some effect on their competitors and on the growth of the Griffith circuit. Its extent must be determined on a remand of the cause. We remit to the District Court not only that problem but also the fashioning of a decree which will undo as near as may be the wrongs that were done and prevent their recurrence in the future. (Citing authorities.)"

Thus it will be seen that more than nine years had elapsed between the filing of the original complaint and the decision by the Supreme Court. During this nine-year period many changes had taken place. Before the first trial in the District Court, the government dismissed as to all of the distributor-defendants, and R. E. Griffith, one of the defendants, had died and the cause was not revived against his representative.

At the time of R. E. Griffith's death he was a majority stockholder in R. E. Griffith Theatres, Inc., and also owned stock in Westex, Amusement and Partnership Theatres, Inc. The assets of the estate consisted of stock in the above-named motion picture corporations and in Hotel El Rancho, Inc., at Gallup, New

Mexico, life insurance in the approximate amount of $200,000 and cash in the approximate amount of $45,000. The liabilities of the estate consisted of an indebtedness of approximately $250,000 to his estranged wife, notes payable to banks and others in the approximate amount of $266,000 and inheritance tax liabilities to the United States Government and the State of Texas in the amount of approximately $250,000. The indebtedness to Mrs. Griffith under a settlement agreement was secured by pledge of all of the insurance and other assets. The executors made settlement of the claim by delivering to her all of the insurance and the cash on hand, which left assets consisting of the stock in the aforesaid corporations. In order to obtain funds with which to pay the other liabilities of the estate and to preserve some of the estate for the children of R. E. Griffith, it was necessary to liquidate the stock interests. The executors, after much consideration and study, arranged for the sale of the physical assets of the corporations in which R. E. Griffith had been interested.

On March 31, 1945, prior to the first trial, Westex sold its interest in 10 theatres in Alvin, Bay City, El Campo, Texas City, Victoria and Wharton, in the state of Texas. On October 24, 1945, a new corporation was organized under the name of Griffith Enterprises, Inc., and later changed to Theatre Enterprises, Inc., on November 12, 1945, The organizers of Theatre Enterprises were R. A. Higdon, Fred Morley, Ted Jones, R. I. Payne, Fred Hoenscheidt, Harold Harris, Frank Plumlee, J. V. Beauchamp, R. E. Davis, F. L. Stocker, W. J. Moore, Jr., Ballard Barron, Jo Mattison Griffing, H. J. Griffith, Julie Joan Griffith Trust and Rupert Earl Griffith Trust. Of that group, eight were officers and directors of R. E. Griffith Theatres, or Westex, or both. As of May 12, 1949, only ten of such individual incorporators of Theatre Enterprises were stockholders in the corporation and the number of stockholders had been increased to thirty five. Theatre Enterprises was a separate and distinct corporation and not a continuation of R. E. Griffith Theatres, Inc., or Westex.

On December 1, 1945, Westex was merged with R. E. Griffith Theatres which held a controlling stock interest therein. The assets of Westex have been disposed of, the proceeds distributed to shareholders and all outstanding stock has been cancelled. It now owns no interest in any theatre or any corporation engaged in the motion picture business, and the corporation is being liquidated.

On December 1, 1945, Amusement owned 59 theatres in 22 towns in Oklahoma and Texas. On that date it sold to Consolidated its interest in all of said theatres, except those in Chandler, Kermit and Wink. On November 30, 1946 it sold Consolidated the theatres in those three towns. Amusement has not owned, operated or had any interest in any theatre since November 30, 1946, and the proceeds from the sale of its assets have been distributed to the shareholders and all outstanding stock has been cancelled.

On September 15, 1948, Consolidated owned 152 theatres in 49 towns, including an interest in seven theatres in Lubbock, Texas, owned by Lindsey Theatres, Inc., and an interest in 11 theatres in Tulsa, owned by Griffith Metropolitan Theatres, Inc. As of September 15, 1948, there was competition in 25 towns and no competition in 24 towns in which it was operating, as compared with the situation which existed on April 28, 1939, when the theatres owned by Amusement and those owned by Consolidated aggregated 126 theatres in 53 towns, with competition in 27 towns and no competition in 26 towns.

As of May 16, 1949, there were 3,360 shares of Consolidated stock outstanding, of which L. C. Griffith owned 2,001 shares. No stock in said corporation is owned by any other defendant or by the estate of R. E. Griffith, or by any heir or devisee of R. E. Griffith. The largest number of shares owned by any stockholder other than L. C. Griffith was 225, owned by Verna Mae England.

H. J. Griffith was a stockholder and officer in Amusement and Consolidated from the time of the organization of

each until February 21, 1944. At that time he disposed of his stock in each and since then has not been a stockholder, director or officer in either corporation. About mid-December, 1938, H. J. Griffith terminated his employment with Amusement and Consolidated, and subsequently did not participate in the affairs or business of either corporation. Although he remained an officer and director for some time thereafter, he was not active in either capacity. During the time that he was employed by Amusement and Consolidated, until the termination of that employment, his duties consisted of purchasing supplies and equipment looking after the lighting, heating ventilation in the physical properties of Amusement and Consolidated. During his connection with said corporations, he did not individually participate in the licensing and booking of pictures for the theatres, nor in directing the policies of either corporation relative to the licensing and booking of pictures.

H. J. Griffith as an individual did not, for his own account or as a principal, enter into or participate in the licensing methods which were held to be unlawful by the Supreme Court. About June 1, 1946, he merged a circuit of theatres owned by him in Kansas, Missouri and Nebraska with those of Theatre Enterprises. He was issued stock in payment therefor, which gave him a sixty per cent stock interest in Theatre Enterprises. Thereupon he became president of that corporation and has continued to hold that position.

The present status of the defendant exhibitors, the particular facts relative to the acquisition, operation or sale of each theatre during the period involved, and the licensing contracts for films for each theatre are treated in detail in the findings of fact and will not be discussed in this opinion.

After this cause came back from the Supreme Court and on October 15, 1948, the plaintiff filed a motion to make Theatre Enterprises a party defendant. The court reserved its ruling thereon but permitted the government to offer its testimony to the same extent as if said motion had been sustained.

The Supreme Court stated "It was during that five-year period that the acts and practices occurred which * * * constitute violations of §§ 1 and 2 of the Sherman Act", meaning the five-year period ending April, 1939. Theatre Enterprises was not organized until October, 1945, more than five years thereafter, and could not have performed acts which would come within the five-year period stated by the Supreme Court.

▪ Any final judgment which this court may enter herein may be effectively enforced against Theatre Enterprises without it being made a party defendant herein. As stated in the defendants' brief: "Under Rule 25(c) [Fed.Rules Civ.Proc. 28 U.S. C.A.] where during the pendency of an action one who is not a party thereto acquires an interest in the subject matter of the action, such person may be made a party in the discretion of the court. However, if the court, in the exercise of its discretion does not add such party, the final judgment rendered therein is binding upon such party and may be enforced to such extent as if he were one of the original parties thereto." Regal Knitwear Co. v. National Labor Relations Board, 324 U.S. 9, 65 S.Ct. 478, 89 L.Ed. 661, and a long line of decisions.

▪ It certainly cannot be contended, under the evidence, that Theatre Enterprises was exercising buying power of the entire circuit to negotiate films for its competitive as well as its closed towns, since the undisputed evidence is that Theatre Enterprises, since the decision of the Supreme Court, has licensed its pictures theatre by theatre and that each contract is independent of all other contracts. Therefore, the motion to make Theatre Enterprises a party defendant is overruled and an exception allowed.

▪ The cause proceeded to trial the second time for the sole purpose of deter-

mining "what effect these practices actually had on the competitors of appellee exhibitors or on the growth of the Griffith circuit." This court was of the opinion then, and is now, that the only acts that can be considered as effecting the result, which were in violation of the Sherman Act, were the acts within the five-year period immediately preceding April, 1939. Notwithstanding, the government insisted upon reintroducing practically all of the evidence that was introduced in the first trial. The second trial occupied 43 court days, or practically 9 weeks: 9 days in November and December, 1948; 11 days in January and February, 1949; 20 days in April and May, 1949, and 3 days in June, 1949, the record consisting of 5398 typewritten pages of testimony and 682 exhibits, amounting to 2531 pages. The testimony offered by the government included the history of the ownership, the physical conditions, the general course of operation and the contracts licensing films, in 331 theatres in 101 towns, covering three states. In other words, the two trials occupied 15 weeks in which there were introduced 1443 exhibits amounting to 5405 pages and testimony amounting to 9066 typewritten pages.

In making this statement the court has in mind all of the various transactions in the licensing of films, the sale, purchase and ownership of the various theatres, many of which were not even in existence at the time this suit was filed. In order, therefore, that the various issues could be considered properly it has been necessary to make a complete examination of this voluminous record, and in so doing, the court has required requested findings of fact to be submitted, not only covering each theatre in each town, but all of the various contracts for the exhibition of pictures. (T.R. 4873.) Consequently, the findings of fact are extremely voluminous, but this court knows of no way to consider this case properly without a full discussion of each of these transactions.

The great mass of evidence introduced in the second trial was not evidence tending to show the effect of the acts of the defendants during the five-year period preceding 1939, but consisted of acts of operators of theatres up to and including 1949, and even of theatres which were not in existence at the time the suit was filed. This court has attempted to be liberal as to the admission of evidence in order that the plaintiff might completely develop its theory of the case, but to say that evidence is competent which shows acts of the defendants long prior to 1934 and from 1939 to 1949 and that such acts constitute violations of the Sherman Act, as alleged in the original complaint, is contrary to the opinion of the Supreme Court which limits the acts specifically to the five-year period prior to 1939. This evidence has been permitted in order to determine what effect, if any, the acts complained of prior to 1939 had upon the competing exhibitors of the defendants.

The evidence discloses that a great many of the theatres that were in competition with the defendants have been sold or abandoned, but to conclude that this is due to the licensing agreements of the defendants is indulging in pure speculation. It is apparent from the evidence, and particularly from the testimony of every distributor, that there was no agreement of any character entered into between the distributors and these defendants that the pictures would be so licensed as to deprive the competitors of the defendants of an opportunity to purchase. The determining authority as to whether or not a picture would be sold to defendants or to some competing theatre was the distributor who made the contract. A distributor cannot be criticized or condemned for desiring to sell his picture to the theatre which would yield the greatest revenue.

Throughout this case we have been confronted with competition between a defendant's theatre, which in practically every case was an up-to-date theatre with modern furnishings and the latest in operating equipment, as against a converted store building or building that had prior thereto been used for some other purpose, with inferior equipment of every character. Can it be said that because a distributor preferred to sell his picture to a modern

theatre with a management having established credit as against an inferior theatre operated by one with questionable credit, that the exhibitor thereby would be guilty of violating the Sherman Act? This would be true in no other line of business, and it is a situation which exists in hundreds of lines of business to-day throughout the country. Should defendants, because they have expended large sums of money in building and equipping modern theatres, be penalized and refused the right to purchase the best pictures they can purchase except with the consent and permission of competing theatres which in no way compare in equipment, appearance or operation? An examination of the record discloses that in practically every case where a competing theatre was equivalent in structure, appearance and equipment to those of the defendants, the distributors have favored their regular customer, or the theatre which first became their customer.

In the findings of fact submitted in the first trial this court held that there was no agreement or understanding of any character between the defendants and the distributors with reference to the exclusion of competing theatres in the purchase of films, and that the contracts made by the distributors were on the theory that it was the best business proposition for them. However, the Supreme Court held: "When the buying power of the entire circuit is used to negotiate films for his competitive as well as his closed towns, he is using monopoly power to expand his empire." And: "Appellees were concededly using their circuit buying power to obtain films. Their closed towns were linked with their competitive towns." Since the decision of the Supreme Court, every contract for the purchase of films has been made on the basis of theatre by theatre. In other words, the contract was made to purchase films for a single theatre without regard to the purchase of films for other theatres. The objection to the course of business employed by the defendants, as stated by the Supreme Court, has been observed and corrected.

In concluding its opinion the Supreme Court said: " * * * On the record as we read it, it cannot be doubted that the monopoly power of appellees had some effect on their competitors and on the growth of the Griffith circuit. Its extent must be determined on a remand of the cause. We remit to the District Court not only that problem but also the fashioning of a decree which will undo as near as may be the wrongs that were done and prevent their recurrence in the future."

Thus it will be seen that two requirements were submitted to the District Court. First, to determine the extent of the effect that the exercise of the monopoly power of the Griffith circuit had upon its competitors, and second, the fashioning of a decree which will undo as near as may be the wrongs that were done and prevent their recurrence in the future.

No evidence was introduced in the second trial showing the extent to which any individual competitor was affected or damaged by these licensing agreements which the Supreme Court held constituted illegal exercise of monopoly power. Some of the competitors sold their theatres to the Griffith circuit and some sold their property to others than the Griffith circuit, but there is no evidence to the effect that they did not receive full value for the property sold, or that the sale was the result of the licensing practices of the defendants, or that it was not a voluntary sale. It would be difficult, therefore, under those circumstances to reach any definite conclusion except by mere speculation as to what damages any competitor sustained.

The further instruction to fashion "a decree which will undo as near as may be the wrongs that were done and prevent their recurrence in the future," has certainly been complied with by those defendants still in business after the decision by the Supreme Court, by licensing each film for each theatre by an individual contract.

■ This court is of the opinion that an injunction should be granted against the defendants, restraining them from licensing films for their closed towns and

competitive towns in single contracts. But just what this court could do under the evidence to "undo as near as may be the wrongs that were done" is again a highly speculative undertaking.

The government insists that Consolidated be ordered and directed to dispose of its interests in practically every town where it is now engaged in business, and Theatre Enterprises be required to dispose of its interest in some thirty towns in New Mexico and Texas when it was not organized until October, 1945, six years after this suit was filed. In other words, the government insists that these corporations, so far as their operations are concerned in the theatre business, be destroyed. This certainly would be a most drastic punishment when the suit was filed in 1939.

At the time of the last trial only Griffith Consolidated Theatres, Inc., L. C. Griffith and H. J. Griffith remained of the original defendants.

Since the decision of the Supreme Court, under the evidence here, the defendants have not used their buying power to obtain films. No effort has been made to link closed towns with competitive towns in the purchase of films, but, as hereinbefore stated, each theatre has had individual contracts for its films.

In view of this situation, ample injunctive relief has been directed to meet the ends of justice in the findings of fact and conclusions of law filed herein.

The findings of fact in the first trial numbered 6, 8, 10, 18, 19, 20, 21, 23, 26, 28, 29 and 30, the last paragraph of 11-4, 11-6, 11-9, 11-13, 11-14, 11-18, 11-19, 11-22, 11-24, 11-25, and the last sentence of 11-16, and the conclusions of law therein made, are vacated and the remainder of the findings of fact therein made are re-adopted and incorporated as a part of the findings in the present trial.

Findings of fact, conclusions of law and a final decree, consistent with this opinion, are filed simultaneously with this opinion.