**JOHN WRIGHT & ASSOCIATES, INC.,**
a Corporation, Appellant,

v.

**Harold R. ULLRICH, Ora G. Jones, Jr., S. B. Foot, Individually and as Members of the T. B. Sheldon Memorial Auditorium Board of the City of Red Wing, Minnesota, City of Red Wing, Minnesota, and James Fraser, Appellees.**

No. 17193.

United States Court of Appeals
Eighth Circuit.

March 2, 1964.

Patrick J. Creamer, Minneapolis, Minn., made argument for appellant and filed brief with Harry H. Peterson, Minneapolis, Minn.

Charles Richardson, of Holst, Vogel & Richardson, Red Wing, Minn., made argument for appellees and filed brief with Grannis & Grannis, by Vance B. Grannis, Sr., South St. Paul, Minn., attorneys for appellees except James Fraser.

Francis H. Watson, Red Wing, Minn., attorney for appellee James Fraser.

Before VAN OOSTERHOUT, MATTHES and MEHAFFY, Circuit Judges.

MEHAFFY, Circuit Judge.

This is an appeal from an adverse judgment of the District Court in a non-

jury, antitrust action in which plaintiff sought injunctive relief and treble damages under the Sherman and Clayton Acts, 15 U.S.C.A. §§ 1–8, and §§ 12–27, respectively.

Plaintiff-appellant, John Wright & Associates, Inc. (hereinafter referred to as "appellant"), is a Minnesota corporation and during the time involved owned and operated a motion picture theater known as the Chief Theater in Red Wing, Minnesota, a city of some eleven thousand population. In 1904, the City of Red Wing, a municipal corporation, acquired the T. B. Sheldon Memorial Auditorium by testamentary disposition which provided for its management to be vested in a five member board to serve without remuneration and selected from resident voters by the city fathers.

All members of the municipality's auditorium board, James Fraser, the present manager of the motion picture theater originally established in the auditorium building in 1911, the Red Wing Publishing Company and its manager, and various film distributors, among others, were joined as defendants in the original action. At the conclusion of the trial but before submission of the case for decision, the action was dismissed as to all defendants except three of the members of the auditorium board, the Auditorium Theater manager, and the publishing company and its manager, who collectively represent the appellees in this appeal.

When the City first acquired the auditorium, it was used for a variety of stage entertainments in addition to public meetings and other civic functions. Motion pictures were first shown in the auditorium in 1911. John Wright, president of appellant corporation, was employed by the Board as manager of the auditorium from 1936 until 1943, leaving to later open his own motion picture theater, the Chief. During all of the times pertinent hereto, the Auditorium and the Chief were the only motion picture theaters within the city limits although there was a drive-in theater in the suburbs of Red Wing. In 1955, the manager of the Auditorium who had replaced Wright

died, and the Board filled the vacancy by accepting the application of Fraser, who was then working for Wright as manager of the Chief.

For many years the Chief and the Auditorium split the available film product pursuant to an oral understanding. The Chief obtained the majority of its films from Universal, RKO, Monogram, and Republic Studios, while the Auditorium's main sources of supply were United Artists, Paramount, and Fox. The two theaters divided equally the films distributed by Warner Brothers and Metro.

Until RKO went out of business shortly before 1956, it had been distributing Walt Disney pictures, recognized as the most popular product of the film industry. Thereafter Disney pictures were distributed by the Buena Vista Company. Soon after Fraser's installation as manager of the Auditorium he asked appellant for an equal division of all the Disney pictures which amounted to from four to eight pictures annually—just a fraction of the approximately one hundred thirty-five pictures shown per year at each theater. He justified his request for alteration of the division arrangement on grounds RKO, whose releases were formerly shown exclusively at the Chief, was no longer in existence and no film product comparable to the quality of the Disney pictures was obtainable elsewhere.

When appellant refused his request, Fraser initiated the practice of bidding for the Disney pictures in the fall of 1956. At first, appellant voluntarily refrained from bidding on the first eight Disney pictures released, but decided in early 1957 to bring an action in Minnesota state court to enjoin the City and the Board from operating a motion picture theater in the auditorium. Ultimately, the Minnesota Supreme Court in 1958 upheld a decision enjoining the municipality from operating a movie theater in private competition with appellant. John Wright & Associates, Inc. v. City of Red Wing, 254 Minn. 1, 93 N.W.2d 660 (1958).

To legally circumvent the effect of this decision, the Board leased the motion picture theater portion of the auditorium to Fraser in February, 1959, for a monthly rental of $500.00. In a subsequent suit by appellant attacking the lease agreement, the Minnesota Supreme Court held the lease valid and Fraser continued operating the Auditorium Theater as an independent enterprise. John Wright & Associates, Inc. v. City of Red Wing, 259 Minn. 111, 106 N.W.2d 205 (1960).

During the period from the fall of 1956 until the lease was executed in February, 1959, there was no bidding for films between the Auditorium and the Chief, except for the Disney product. While appellant deferred from bidding on the first eight Disney films, it eventually bid on the remaining six of the fourteen released during this period and obtained three. After the lease of the Auditorium Theater to Fraser, there was a dearth of attractive films available from all the distributors and bidding was instituted for all the distributors' films. Experiencing a continual decline in profits thereafter, appellant subsequently closed the Chief Theater and went out of business in July of 1960, charging appellees with antitrust violations. Appellant maintains that the ultimate closing of its theater through appellees' combined use of an advantageous competitive position as a municipality and excessive bidding practices resulted in a monopolization of the market by the Auditorium proscribed by § 2 of the Sherman Act.

Of the voluminous record consisting of over twelve hundred pages of testimony, appellant has furnished us with but thirty pages as support for his claims regarding the trial court's erroneous findings based on the evidence. Notwithstanding appellant's failure to send up a sufficient amount of the printed record in support of the questions raised in its appeal contrary to Rule 10(b) of this Court, we have decided the considerable amount of time and ostensible cost expended by the parties to this litigation justifies this Court in availing itself of the original record in order to dispose of the important issues before it.

Appellant first contends that the trial court erred in its finding appellant was required and failed to prove a "specific intent" by appellees to monopolize as necessary to a prima facie violation of § 2 of the Sherman Act. Appellant points to excerpts of the court's post-trial memorandum as indicative of this error:

> "It must be remembered that it is the existence of the power to exclude competitors from a particular field of interstate commerce, together with the intent to exercise such power, which is condemned by the antitrust laws."
>
> \* \* \* \* \*
>
> "(T)he evidence, when examined in the light of the antitrust principles previously discussed, does not reveal any substantial basis from which to infer \* \* \* the existence of any intent on the part of defendants to exercise monoply power to the detriment of plaintiff."

A study of the entire findings and opinion of the trial court amply demonstrates that the element of intent was not improperly applied with respect to appellant's burden of proof, but the trial court in its references to proof of intent vis-a-vis the statute correctly applied the long standing principles laid down by the Supreme Court in the antitrust field.

In United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948), defendant corporations operated motion picture theaters in numerous towns, in some of which they had no competitors. Defendants used their exclusive buying power in the closed towns of the circuit as an economic lever to obtain superior privileges from film distributors in the areas where competition existed, preventing these competitors from purchasing sufficient films of the necessary quality to operate profitably. Holding that the defendants wrongfully employed their lawfully acquired monopoly power as a trade weapon against competitors, Justice

Douglas said the following concerning the element of intent:

"It is * * * not always necessary to find a specific intent to restrain trade or to build a monopoly in order to find that the anti-trust laws have been violated. It is sufficient that a restraint of trade or monopoly results as the consequence of a defendant's conduct or business arrangements. * * * Specific intent in the sense in which the common law used the term is necessary only where the acts fall short of the results condemned by the Act.

\* \* \* \* \* \*

"When the buying power of the entire circuit is used to negotiate films for his competitive as well as his closed towns, he is using monopoly power to expand his empire. And even if we assume that a specific intent to accomplish that result is absent, he is chargeable in legal contemplation with that purpose since the end result is the necessary and direct consequence of what he did." United States v. Griffith, supra, 334 U.S. at 105 and 108, 68 S.Ct. at 944 and 946, 92 L.Ed. 1236.

Thus, when faced with application of § 2 to the pioneers of the corporate empire, the Supreme Court ruled that a corporation could exercise such power and control over a particular industry by virtue of its enormity as to give rise to a presumption of an intent of unlawful domination. Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1910); United States v. Patten, 226 U.S. 525, 33 S.Ct. 141, 57 L.Ed. 333 (1913). In meeting just such a situation, presented in United States v. Aluminum Co. of America, 148 F.2d 416 (2nd Cir. 1945), Judge Learned Hand laid down the test that to violate the antitrust laws, the monopolist must have both the power and intent to monopolize. In applying this standard to condemn as monopolistic the Alcoa organization, he differentiated between "specific" intent and the legally implied intent acknowledged by the Supreme Court as organic to an existing monopoly which not only possesses monopoly power but by its very nature intended to capture the market as the natural result of its activities:

"To read the passage as demanding any 'specific,' intent, makes nonsense of it, for no monopolist monopolizes unconscious of what he is doing. So here, 'Alcoa' meant to keep, and did keep, that complete and exclusive hold upon the ingot market with which it started. That was to 'monopolize' that market, however innocently it otherwise proceeded." United States v. Aluminum Co. of America, supra, 148 F.2d at 432.

Important dicta in the Alcoa case is Judge Hand's pronouncement that not all monopolies are illegal.

"(P)ersons may unwittingly find themselves in possession ⸴ of a monopoly, automatically so to say * * * without having intended either to put an end to existing competition, or to prevent competition from arising when none had existed; they may become monopolies by force of accident. Since the Act makes 'monopolizing' a crime, as well as a civil wrong, it would be not only unfair, but presumably contrary to the intent of Congress, to include such instances." United States v. Aluminum Co. of America, supra, 148 F.2d at 429–430.

Thus, the combined effect of all these decisions provides us with the principles that (1) certain existent monopolies restrict trade and are inherently unlawful requiring no proof of intent to sustain a violation of § 2; (2) attempts to build a monopoly but short of materialization necessitate the showing of a specific intent for guilt to attach; and (3) "accidental monopolies" enjoyed by certain organizations with the only one of its kind in a given market are outside the proscription of the antitrust laws because healthy, successful competition, the object of which is not to restrict trade, is to be encouraged, not condemned. In the instant case, appellant incorrectly as-

sumes proof of intent was unnecessary because it labored under the erroneous premise the trial court was obliged to find an inherently unlawful monopoly existed under the first category described above.

 The trial court did hold that mere operation of the only movie theater in a town, absent proof of intent to destroy competition and restrict trade, was monopoly power in the popular sense only, or described differently—an "accidental monopoly", which is not illegal in and of itself. From the evidence, the trial court correctly found no intent, specific or otherwise, on the part of appellees to damage appellant's business or eliminate it as a competitor, in becoming an "accidental monopoly" after appellant closed its doors.

Contrawise, appellant asserts that the evidence manifests a deliberate acquisition of monopoly power by appellees through the media of advantageous competitive position and excessive bidding practices.

Appellant maintains that from 1956 until early 1959 the Auditorium Theater was immune from city taxes, licenses, and water bills due to its municipal ownership which, combined with an available sinking fund, enabled it to absorb constant losses and still engage in exorbitant bidding practices against appellant to control the Disney films, the best of the first run film product in the Red Wing market. During this approximate two and one-half year period the bidding complained of pertained to but fourteen Disney films out of a total of over three hundred films shown by each theater under the split-of-production agreement. Appellant, relying upon its exclusive right to the Disney product under the division arrangement, elected not to bid on the first eight Disney pictures. When appellant began bidding against the Auditorium Theater in January of 1958, it obtained the same number of Disney releases as the Auditorium up to the time of the lease to Fraser in February of 1959. There was no showing that the Auditorium's bids were excessive despite the tenuous argument advanced by appellant which at most showed only that the Auditorium's percentage of films cost in comparison with its gross receipts exceeded at times a desired goal of a fixed per cent set by the Board in 1956.

 While observing that the drawback to competitive bidding is increased costs for competing exhibitors, the Second Circuit has nevertheless held that the system is valid provided the films are sold at a fair and reasonable rental in an atmosphere of free and open competition. Royster Drive-In Theatres, Inc. v. American Broadcasting, Inc., 268 F.2d 246 (2nd Cir. 1959), cert. denied 361 U.S. 885, 80 S.Ct. 156, 4 L.Ed.2d 121 (1959). Not only does the evidence in the instant case substantiate the finding the contested bidding from 1956 until 1959 legally conformed to the above criteria, but its overall impact during this period upon antitrust laws would be so inconsequential that the doctrine of de minimis non curat lex precludes its consideration.

After the Auditorium Theater was leased by the Board to Fraser in February, 1959, the lessee paid the lessor a substantial monthly rental and operated the theater under a sole proprietorship paying the City its license fee and maintaining its own operational overhead. Thereafter appellant informed various film distributors via mail of its intent to institute further litigation in state court contesting the lease as a subterfuge and to sue in federal court for violation of the antitrust laws, joining several distributors as defendants in the latter action for alleged conspiracy. Appellant further advised the distributors that it would purchase their films through negotiation but would not divide the product.

After receipt by the film distributors of these letters, Fraser encountered difficulty in obtaining films for the Auditorium. He was confronted with a Hobson's choice—he could close his theater or acquire films under the costly basis of competitive bidding which several of the distributors had advised was now the

only avenue open to him. Fraser chose the lessor of the two evils and commenced bidding for all the pictures. The amount of his bid was based on the following factors: The type of picture offered, the amount of money the film company would spend in advertising the film, income to be expected from theater concessions, his own overhead including anticipated advertising costs, competing local events on the dates for the proposed showing of the film, and the estimated amount his competition might pay for the film.

■ Appellant strenuously urges Fraser's bids were nonetheless excessive, incapable of resulting in a profit, and intended solely to corner the most desirable films for the ultimate purpose of driving appellant out of business. Appellant's proof is predicated on (1) an exhibit prepared by its president, Wright, illustrating the Auditorium's net losses for all Disney films it was awarded from 1956 until 1960 and (2) a comparison of the gross receipts of the Chief and Auditorium for the same period. These exhibits purportedly demonstrated that the Auditorium's losses paralleled its gradual increase in gross receipts while those of the Chief declined. Therefore, appellant concludes that the Auditorium's gross receipts naturally increased as it acquired the bulk of the desirable film product from the Chief, and its disregard for corresponding losses, allegedly caused by excessive bidding, indicated the Auditorium's desire to eliminate its competition and monopolize the market. The flaw, however, in appellant's deductive reasoning was pointed up by testimony of a certified public accountant who analyzed the first exhibit and discovered it improperly included certain costs in the Auditorium Theater's overhead and excluded important income from concessions in arriving at erroneous net losses. In fact, the proper ingredients of income and expense reflected a net profit, rather than a loss, on all of the Disney pictures shown by the Auditorium Theater.

Furthermore, the probative effect of the gross receipts' comparison was emasculated by the fact that appellant's theater closed in July of 1960, and despite the Auditorium's lack of competition for nearly six months of 1960, it had a decline in gross receipts from $51,300.00 in 1959 to $49,300.00 in 1960. In other words, this decline in the Auditorium's gross receipts at a time when, if appellant's theory were adopted, they would necessarily have increased due to a "monopoly" of the entire market, reveals their unreliability as indicative of control of the market's most desirable film product.

Explaining the reason for appellant's decline in gross receipts, the trial court found that from early 1956 until Wright assumed active management of the Chief himself in 1959, it was plagued with a series of inefficient and dishonest managers in addition to suffering from the general box office decline in the movie industry due to the advent of television. While all of the witnesses did not unanimously agree as to the impact of television on the motion picture business, substantial evidence supported this and the related findings of the trial court regarding the cause of appellant's economic misfortune.

The "accidental monopoly" thrust upon the Auditorium Theater was the product of Fraser's being forced to bid for film products in order to maintain the operation of his business. As so deftly put by Judge Hand in United States v. Aluminum Co. of America, supra, 148 F.2d at 430, "The successful competitor, having been urged to compete, must not be turned upon when he wins."

■ The law does not require that a businessman abandon his enterprise before utilizing every lawful means available to survive the vicissitudes of a competitive economy. The very raison d'etre of the Sherman Act was to secure equality of opportunity for the small businessman as well as to protect the public against the evils incident to monopolies. But, it was not the purpose of our antitrust laws to compel competition. Neither did the redactors of the Acts intend to inhibit the intelligent conduct of business operations. Maple Flooring Mfrs.

Ass'n v. United States, 268 U.S. 563, 583, 45 S.Ct. 578, 69 L.Ed. 1093 (1925). Likewise, it is important that the Act be construed to approve lawful, fair, and reasonable expedients devised to promote individual success. Arkansas Brokerage Co. v. Dunn & Powell, 173 F. 899, 35 L.R.A.,N.S., 464 (8th Cir. 1909).

The judgment of the lower court is affirmed.