SAMUEL GOLDWYN PRODUCTIONS, INC., Plaintiff,

v.

FOX WEST COAST THEATRES CORPORATION et al., Defendants.

No. 29756.

United States District Court
N. D. California, S. D.

May 4, 1961.

Supplemental Opinion May 31, 1961.

Joseph L. Alioto, San Francisco, Cal., George Slaff, Los Angeles, Cal., Maxwell Keith, San Francisco, Cal., for plaintiff.

Arthur B. Dunne, San Francisco, Cal., Frederick W. R. Pride, New York City, Bennett W. Priest, Los Angeles, Cal., for Fox defendants.

HARRIS, District Judge.

This is an action tried by the Court without a jury wherein the plaintiff seeks treble damages under the anti-trust laws, against Fox West Coast Theatres Corporation, et al. The suit was filed on May 16, 1950, and after extensive pretrial discovery proceeded to trial before the late Judge Edward P. Murphy.

Prior to trial Judge Murphy made several vital and significant rulings, par-ticularly granting defendants' motion for partial summary judgment and dismissing all claims which occurred prior to May 16, 1947, on the ground that they were barred by the applicable statute of limitations.[1] Also, that the decree in the Paramount case[2] was not admissible in the instant proceedings.

The cause proceeded to trial as against Twentieth Century-Fox Film Corporation, National Theatres Corporation, Fox West Coast Theatres Corporation and Fox West Coast Agency Corporation. Plaintiff's original suit had named additional defendants for whom a separate trial was ordered.

The trial was protracted. It commenced on the 10th day of July, 1957, and was concluded on the 14th day of January, 1958. Plaintiff and defendants called twenty-three witnesses. The trial transcript consisted of 6,500 pages, exclusive of voluminous exhibits, involving a mass of economic, statistical and accounting data. At the conclusion the trial court requested the parties to prepare findings of fact and conclusions of law. The findings submitted were very extensive. References to them are made herein.

Before decision, Judge Murphy died. The cause was reassigned.

On November 19, 1959, and thereafter, counsel for the parties appeared on a pretrial conference for the express purpose of acquainting this Court with the ramifications of the litigation, the scope of the evidence adduced before the late Judge Murphy and the question whether the cause would be resubmitted on the record or whether witnesses would be called de novo.

The Court at the conclusion of the hearing requested additional briefing on the question of "causal relationship" and the issue of impact and continued the matter regularly until February, 1960, for argument on the merits, the Court having decided, upon stipulation of coun-

1. Samuel Goldwyn Productions, Inc. v. Fox West Coast Theatres Corp. et al., D.C., 146 F.Supp. 905.

2. United States v. Paramount Pictures, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260.

sel, to have the cause resubmitted on the record of testimony theretofore elicited.

After extensive oral argument counsel requested time to file additional briefs and the matter was finally submitted for decision on the merits on the 1st day of September, 1960. This last submission was set aside by the Court for the reason that counsel for defendants submitted a supplemental brief. Thereafter counsel for plaintiff on the 10th day of April, 1961, filed a responsive brief and the cause is now ready for decision.

The erosive effect of the influences of both pretrial, trial and subsequent court engagements has narrowed the issues presently before the Court. The difficulties attendant upon a decision in this case are not concerned with any complexity or novelty in legal application. The underlying principles have been carefully enunciated by our Circuit Court, as well as the Supreme Court of the United States.[3]

Plaintiff contends that defendants' violations of the Sherman Act, 15 U.S.C.A. § 1 et seq., and the Clayton Act, 15 U.S. C.A. § 12 et seq., through the practices charged, have injured plaintiff in its business of producing and distributing motion pictures by reason of the low rentals plaintiff was compelled to accept in the marketing of the specific pictures involved in this litigation.

Defendants deny that the film rentals negotiated by plaintiff's distributor R. K.O., were less than the product itself deserved in each instance. Defendants assert that the present litigation arises because the seller, after disposing of his product, would now like to re-negotiate on a more profitable basis. They deny a violation of the antitrust laws through conspiracy or monopoly and contend that plaintiff received that to which he was entitled in a competitive market.

Defendants contend that the Goldwyn product had deteriorated and that the pictures were progressively less well received in the market.[4] Also, that the law suit was brought through personal pique.

Defendants further contend that the plaintiff had outlets available other than the National Theatres Corporation (hereafter N.T.C.)[5] representing approximately 600 theatres situated strategically throughout the United States. Also, that Goldwyn "sold away" to certain of his customers and attempted to put pressure on the defendants.

The plaintiff states that the record is clear, that Goldwyn struggled against the practices of the Fox chain from the middle twenties down to date.

---

3. *Restraint and Liability:*
   United States v. Paramount Pictures et al., 334 U.S. 131, 68 S.Ct. 915, 92 L. Ed. 1260; Schine Chain Theatres v. United States, 334 U.S. 110, 68 S.Ct. 947, 92 L.Ed. 1245; United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 942, 92 L.Ed. 1236; United States v. Crescent Amusement Co., 323 U.S. 173, 65 S.Ct. 254, 89 L.Ed. 160.
   *Damage:*
   Eastman Kodak Co. of New York v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684; Story Parchment Co. v. Paterson Parchment Paper Co. et al., 282 U.S. 555, 51 S.Ct. 248, 250, 75 L.Ed. 544; Bigelow v. RKO Radio Pictures, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652; Mandeville Island Farms v. American Crystal Sugar Co., 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328; Paradise Theatre Bldg. Corp. v. Fox West Coast Theatres Corp. et al.,

9 Cir., 264 F.2d 602; Flintkote Co. v. Lysfjord, 9 Cir., 246 F.2d 368; Richfield Oil Corp. v. Karseal Corp., 9 Cir., 271 F. 2d 709; Continental Ore Co. et al. v. Union Carbide & Carbon Corp. et al., 9 Cir., 289 F.2d 86.

4. See Beggs' testimony, Tr. 5942: " 'Roseanna McCoy' and 'My Foolish Heart' obviously had a very small exhibition in NTC and on this basis comparison of the playoff results of these two Goldwyn pictures with other features of the same season would be highly questionable."

5. According to the record, in May 1947 defendant NTC owned, leased or operated through direct and indirect subsidiaries 597 theatres located in 189 incorporated cities. By May 1950 the number of theatres held had decreased to 526, located in 185 incorporated cities.

It is to be observed that this is not the case of an obscure, lone exhibitor striving to obtain a product on a competitive basis.[6]

Samuel Goldwyn, an outstanding producer of motion pictures and a powerful figure in the industry, came to the market in 1947–50 with seven motion pictures. His bargaining agent and distributor was R.K.O.

The pictures ranked among the feature motion pictures shown in the film seasons in which each was respectively released as follows:

| Goldwyn Release | Rank |
| --- | --- |
| Walter Mitty | 16 |
| Bishop's Wife | 17 |
| Best years (reissue) | 33 |
| Song is Born | 40 |
| Enchantment | 80 |
| Roseanna McCoy | 47 |
| Foolish Heart | 52 |

*The Question of Liability:*

Plaintiff is required to prove restraint and injurious impact.

The conspiracy as outlined by plaintiff was a many faceted one to violate Sections 1 and 2 of the Sherman Act in gaining monopolistic control in the marketing areas wherein defendants owned or operated theatres. Defendants created local pockets of monopoly and joined therein a national buying combine.[7]

*The Joint Alliances and Pools:*

The jointly held corporations and enterprises existing between National Theatres Corporation (NTC) and putative competitors were illegal and declared such by the Supreme Court in United States v. Paramount Pictures, 334 U.S. 131, 149, 68 S.Ct. 915, 92 L.Ed. 1260 and ordered divested upon the showing that the other parties were potential competitors.[8]

Several of these joint arrangements were in existence during the period involved herein, to-wit: *1947 to 1950.* The impact upon the Goldwyn organization is manifest.

"These provisions in the decree will stand. The practices were bold efforts to substitute monopoly for competition and to strengthen the hold of the exhibitor defendants on the industry by alignment of competitors on their side. Clearer restraints of trade are difficult to imagine." [9]

The Supreme Court in the Paramount case remanded the action for consideration by the District Court. Following the remand, the District Court entered an order based on the consent of the United States and Twentieth Century Fox Film Corporation dated December 17, 1948:

"1. Plaintiff having claimed and offered evidence that certain corporations are owned jointly by National Theatre Corporation, together with an actual or potential independent exhibitor, said corporation being listed in plaintiff's proposed finding 115; and plaintiff having petitioned this court for the entry of an order requiring National Theatres Corporation to dispose of its joint interest in such corporation in order to terminate such continuing restraints of competition as may arise therefrom." [10]

The final decree of February 8, 1950, prevents the defendants from entering into joint theatre arrangements.[11]

It is difficult, if not impossible, to delineate herein all of the alliances,

---

6. Carter v. Twentieth Century-Fox Film Corp., D.C., 127 F.Supp. 675.

7. Pltf's proposed findings, pp. 20–28, 3095.

8. The NTC circuit was divested effective June 7, 1951.

9. United States v. Paramount Pictures, 334 U.S. 131, at page 149, 68 S.Ct. 915, at page 925, 92 L.Ed. 1260. Cf. Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328.

10. Pltf's Ex. 61.

11. Plft's Ex. 376 for id.

agreements regarding division and allocation of product, "gentlemanly understandings," "harmonious working arrangements" and collusive conduct that permeate the vast record before the Court. On the question of restraint and impact it is not unfair to say that the orders and decrees in the Paramount case were barely made and entered when Fox set in motion, through its agents, a series of practices and transactions designed to circumvent and avoid the significant teaching of the Paramount case.

Whether these efforts to continue the monopoly were subtle and refined, or bold is of no particular moment. Suffice, that the testimony is replete with instances of conduct reminiscent of the practices condemned and proscribed by our Supreme Court.

Defendants assert that the joint alliances had no unreasonable effect on any defined market.

The following demonstrates to the contrary and is illustrative of the difficulties attendant upon the plaintiff in disposing of his product in a free, competitive market:

(a) Defendants contend that there was a substantial theatre competition in downtown Los Angeles. There were 13 Fox theatres, 2 R.K.O., 2 Fanchon Marco-Paramount, 4 Warner Bros., and 3 Blumenfeld.

These asserted substantial competitors were still meeting once a week and allocating motion pictures and products down to the date of trial.[12]

The Lundgren book demonstrates a clear allocation system.[13] Examples of splitting products may be found in San Francisco's Mission district; for Seattle, Spokane, Inglewood, etc., similar practices occurred.[14]

(b) N.T.C. or Fox West Coast did not compete in any city or town within the Naify circuit for many years. Where Fox and Naify operated theatres in the same communities they formed joint ventures or alliances and collusively split products.

Not until after the beginning of the period in this suit was the Fox-Naify combine broken up under the Paramount order of December 20, 1948.

(c) It was Fox's original policy to maintain their exhibition agreements as a secret. Otherwise, it would not be necessary to meet in parked cars on remote hillsides or in quiet offices where the products would be divided by pooling lots or drawing markers out of a hat. This, even since the Paramount decree and the commencement of the instant litigation.[15] However, the defendants contend that the plaintiff knew, or should have known, or consented to the division of products. This is not borne out by the record. Neither is the assertion that the Department of Justice had been informed by Mr. Pirosh of the arrangements. Mr. Marcus, attorney for the Department, gave negative testimony denying such knowledge or implied consent. Mr. Marcus' testimony is believable and true and Pirosh's statements in this respect should be rejected.

(d) Plaintiff contends that the avoidance or elimination on the part of Fox, through N.T.C., of competitive bidding, whenever possible, resulted in a depreciated price for the product. This is also borne out by the record.[16] The question of competitive bidding as a compulsory mode of doing business is on debatable ground. Although the District Court in the Paramount case approved this method, the Supreme Court refused to require it, indicating that it would involve

---

12. Tr. pp. 3749-3753; 3761; 3768; Cf. 1917.

13. Pltf's Ex. 11 and 12; Tr. 1860-65, et seq.

14. Tr. 2545-2556.

15. Tr. 2282.

16. Defendants' classified pictures (internally) A, B or C, for bargaining purposes with producers and thereby established a rental schedule which made true negotiation on the part of plaintiff a futile gesture. Tr. 2179-84.

the courts in constantly supervising the economics of the industry.

It is fair to observe that the defendants herein advanced before our Court of Appeal in the Paradise case, 264 F.2d 602, the validity of competitive bidding. In any event the statistical data discloses that in those instances wherein competitive bidding was engaged in the benefits flowing to Goldwyn were appreciable.[17]

(e) Impact is further demonstrated when, as it appears, the plaintiff was obliged to sell the product to the monopolist Fox as a matter of economic necessity. The testimony of Mr. Mulvey is clear and convincing to the effect that plaintiff's alternative was either to do business with defendant's circuit or "stay out and lose a fortune." [18]

Mulvey spent a career of approximately 35 years in the industry. His testimony simply cannot be ignored or treated cavalierly.

The late Judge Murphy was apparently impressed with the bases for Mulvey's conclusions, although the record reflects that Mulvey may not have been familiar with all of the infinite details.

"The Court. I think his testimony to me is crystal-clear that he took into consideration, not Oakland, particularly, not the situations in such-and-such a place, but the overall picture. I consider his testimony to mean it is all-embracing, he took in all factors, including division of product, including allocation of various things—all of them were joined together and formed his concept which dictated his future activity." [19]

Further, the Court observed that " * * * he (Mulvey) cannot be expected to pinpoint all of these various situations."[20]

The plaintiff had no alternative but that of dealing with defendants largely on their own terms; this is borne out by the testimony of Mr. Mulvey.

Mochrie was obliged to accept Fox's circuit-wide terms and made clear the compulsion exercised upon R.K.O. by N. T.C. He could not obtain the requested percentage terms for the Goldwyn pictures, nor with respect to playing time would Fox give a commitment for any more than ordinary playing time.[21]

"There is no other form the deal could take, other than flat rental; it took that form. If I had been unable to negotiate a flat rental deal, that was in my opinion better than the percentage deal which I had rejected, the only third recourse was not to sell. I don't know of any other form this deal could have taken.

"Mr. Pride: Or sell a competitive theatre?

"The Witness: Well, Mr. Pride, there were very many situations to the best of my knowledge where there were no competitive theatres.

"Mr. Pride: Right.

"The Witness: If I failed to sell the Fox circuit, there would be, in my opinion, a considerable loss of revenue to the Goldwyn pictures period." [22]

The facts demonstrate that the defendants, although ostensibly bargaining on a competitive basis, refused in the majority of the transactions and situations to purchase other than on their own terms, i. e., a flat rental basis covering the theatres in the circuit or combine as a whole.

Particularly was this so on the second-run houses. Also, they refused guaranteed playing time.

Plaintiff was required to engage R. K.O. as distribution agent on a substantial percentage of total rentals, made

17. Pltf's Ex. 215; Tr. 2212, 2239, 3027, 3546, 5748.

18. Tr. 4759.

19. Tr. 4487.

20. Tr. 4680, et seq.

21. Mochrie deposition, Pltf's Ex. 367, pp. 27, 30, 49, 50, 59, 61, 78.

22. Mochrie deposition, Pltf's 367, p. 112.

necessary by reason of the monopoly control by the Paramount defendants.[23]

R.K.O. admittedly was an energetic bargaining agency and had a substantial stake in the transaction.[24] Nonetheless, plaintiff was caused to earn less total rentals than would be earned in a free competitive market.

When the whole record is considered it is apparent that Goldwyn as a practical matter had to sell to the defendant NTC largely on its terms. Fox did business as a theatre circuit in totality, requiring a producer of films to do business with Fox or lose a fortune.[25] Although the veneer and plausibility of competitive bargaining was seemingly engaged in by NTC, the final decisions were made substantially on their own terms.

On the issue of restraint and impact the record demonstrates that plaintiff has discharged the burden of proof.

The issue of liability having been determined, the question of the amount and extent of the damages suffered by plaintiff shall be determined by the Court on the 15th day of May, 1961.

Findings of fact and conclusions of law may be prepared in accordance with the foregoing opinion and order.

## Supplemental Opinion

The issue of liability having been heretofore determined by the Court, the questions surrounding the issue of damages may now be discussed and determined.

## Damages

Plaintiff has not claimed that there is any one specific measure of damages applicable herein. Throughout the oral arguments and the briefs, the Court's attention has been directed to the dollar amounts of additional film rental which plaintiff would be entitled to according to different individual measures and theories of damage.

The Court has been urged to consider them all and to make a final determination based upon the application of its informed judgment to all these indicia of the amount of damages.

The mass of accounting and economic data does not permit of mathematical precision in arriving at a just and reasonable amount.[26] All of the subject matter including the expert opinion testimony, must be collated, sifted and weighed by the fact finder to the end that the Court may ultimately make a just and reasonable estimate based on

---

23. Cf. Tr. 4661, 4662. Conant, "Antitrust in the Motion Picture Industry," p. 47: "Nevertheless, control by the five major defendants over key theaters gave them power to exclude other distributors from a large share of the exhibition market. For this reason the independent producer of better quality, more costly pictures had to turn to a member of the combination for distribution in order to secure entry into enough key theaters for revenues to cover his costs."

24. Conant, p. 80: "Only the few established independent producers with leading stars under contract, as Samuel Goldwyn, could secure distribution through RKO for 17.5 per cent of total rentals. (20% in this case) Other distributors paid 25 per cent. Even Goldwyn was required to pay 25 per cent of gross rentals for distribution of certain English films which he had acquired."

25. Tr. 3536–3537; 3856; 3176–3181; 3982; 3987. The scope of defendants' operations and the power it was able to exercise in its dealings with plaintiff, together with its practices as set forth in some detail, supra (allocations with "competitors"; joint ventures with Naify; secret meetings subsequent to advent of this suit, etc.), establish a mode of conduct proscribed in United States v. Griffith et al., 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236, and fulfill the requirements for specific intent within the meaning of §§ 1 and 2 of the Sherman Act. As stated by the court at page 108 of 334 U.S., at page 946 of 68 S.Ct., " * * * even if we assume that a specific intent to accomplish the result is absent, (defendant) is chargeable in legal contemplation with that purpose since the end result is the necessary and direct consequence of what (defendant) did."

26. Richfield Oil Corporation v. Karseal Corporation, 9 Cir., 271 F.2d 709, 715.

relevant data as to the amount of damage, and render judgment accordingly.

Plaintiff argues: "That there is not in any recorded case under the antitrust laws a plethora of evidence as strong in depth and in extent to support a reasonable inference of damage as is contained in this record."

Although this is an ambitious statement, it may be observed that the record does demonstrate abundant evidence to afford the trier of fact a predicate upon which to measure the damage award.

> "Such damage need not be made patent item by item as on a balance sheet. The mere unlawful combination over a period of time to eliminate competition is proof of damage." [27]

The qualification and experience of plaintiff; the state of the industry both before and after the relevant period, as well as during it; the defendants' financial records; financial figures of the pictures involved, and the costs thereof; the rentals received from the Fox defendants and the Naify circuit; the rentals received from other exhibitors; the profits and losses of the pictures to the plaintiff; the profits made by the defendants; a comparison of the licensing of these pictures by competitive bidding as against negotiation; a comparison of the playing time of these pictures in Fox as against non-Fox houses; evidence of the quality or lack of quality of the pictures from the viewpoint of box-office attractiveness; the comparative position of these pictures in relation to other pictures based on national box-office gross; a comparison of competitive bidding results with negotiated results in the Fox situations on the same picture.

Before considering the opinion testimony from the experts and the extrajudicial admissions contained in the record, as well as the claimed damages reflected by the various statistical and accounting studies, it is well to have certain principles in mind emanating from the Supreme Court and the Ninth Circuit:

In Story Parchment Co. v. Paterson Parchment Paper Co.,[28] the Court said:

> "Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise."

> \*       \*       \*       \*       \*       \*

> "And when, from the nature of the case, the amount of the damages cannot be estimated with certainty, or only a part of them can be so estimated, we can see no objection to placing before the jury all the facts and circumstances of the case, having any tendency to show damages, or their probable amount; so as to enable them to make the most intelligible and probable estimate which the nature of the case will permit."

Judge Barnes, in Flintkote Company v. Lysfjord,[29] set forth the controlling rules which are applicable to the case at bar:

> "We take it that the controlling rule today in seeking damages for loss of profits in antitrust cases is

---

27. Fox West Coast Theatres Corp. v. Paradise Theatre Building Corp., 9 Cir., 264 F.2d 602, 608.

28. 282 U.S. 555, 563, 564, 51 S.Ct. 248, 250, 75 L.Ed. 544.

29. 9 Cir., 246 F.2d 368, at page 392.

that the plaintiff is required to establish with reasonable probability the existence of some causal connection between defendant's wrongful act and some loss of anticipated revenue. Once that has been accomplished, the jury will be permitted to 'make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly.' Bigelow v. RKO Radio Pictures, Inc., supra, 327 U.S. 251, at page 264, 66 S.Ct. 574, at page 580, 90 L.Ed. 652. The cases have drawn a distinction between the quantum of proof necessary to show the fact as distinguished from the amount of damage; the burden as to the former is the more stringent one. In other words, the fact of injury must first be shown before the jury is allowed to estimate the amount of damage." [30]

In determining the fundamental tendencies from the elaborate accounting data, it will simplify our problem if we adopt a summary, the predicate for which may be beyond dispute. Such may be found in the figures of Dr. Beggs of Stanford Research Institute, a witness produced by the defendants.[31]

a. How did NTC treat the Goldwyn pictures in terms of film rental as compared to the treatment accorded the same features by other exhibitors, nationwide?

The following figures are expressed in terms of percentage of film rental paid to gross admissions—which means the number of dollars of box office receipts:

| Plaintiff's Picture | All non-NTC first-run selected by Beggs including Paramount case defendants | All non-NTC first-run selected by Beggs exclusive of Paramount case defendants | All non-NTC first run selected by Beggs exclusive of Paramount case defendants and other major circuits | NTC first-run selected by Beggs |
|---|---|---|---|---|
| The Secret Life of Walter Mitty | 38.2% | 39.9% | 41.7% | 35.5% |
| The Bishop's Wife | 37.7% | 39.0% | 41.5% | 41.9% |
| The Best Years of Our Lives (G.R.) | 35.3% | 36.8% | 37.3% | 32.4% |
| A Song is Born | 34.5% | 35.8% | 37.1% | 30.7% |
| Enchantment | 34.2% | 36.7% | 38.9% | 30.6% |

Counsel for plaintiff has provided the Court with a comprehensive compendium based upon the Beggs' work sheets and data, prefaced with the note that they have felt sensitive that the figures they themselves have advanced have been

---

30. Eastman Kodak Co. of New York v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684; Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652; Richfield Oil Corp. v. Karseal Corp., 9 Cir., 271 F.2d 709; Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co., 9 Cir., 284 F.2d 1; Cf. Continental Ore Co. et al. v. Union Carbide & Carbon Corp. et al., supra.

31. Senior Economist, Stanford Research Institute, Menlo Park, California.

criticized. There can be no dispute as to the reliability of the Beggs' data and its applicability to damages.

Expressed in terms of dollars respecting columns 3. and 4., as above:

|  | Column 3 | Column 4 |
|---|---|---|
|  | All Non-NTC first-run selected by Beggs, exclusive of Paramount case defendants and other major circuits (Dollars of film rent per $1000 of gross admissions) | NTC first-run selected by Beggs (Dollars of film rent per $1000 of gross admissions) |
| The Secret Life of Walter Mitty | $417.00 | $355.00 |
| The Bishop's Wife | 415.00 | 419.00 |
| The Best Years of our Lives (GR) | 373.00 | 324.00 |
| A Song is Born | 371.00 | 307.00 |
| Enchantment | 389.00 | 306.00 |

The basic figures were used by Dr. Beggs in Ex. 197, "Relationship Between Gross Admissions Per Unit and Film Rental Per Unit in Selected Cities of the United States.[32]

The underlying figures embraced in the foregoing table are in turn reflected in defendants' charts determinative of the "line of best fit" depicting through the medium of black and red dots the relationship of film rental per unit to gross admission per unit.[33]

We have, therefore, basic figures which defendants have relied upon. These figures demonstrate that Goldwyn received far less film rental from NTC than he received from other exhibitors, particularly those whose actions were free from monopoly conditions. In terms of comparison the plaintiff received some $62,000 less from NTC for the "Secret Life of Walter Mitty" than it actually would have received under similar conditions absent the illegal monopoly of NTC; and some $29,000 less from NTC for "Enchantment" than the plaintiff actually received from non-NTC exhibitors under similar circumstances. Again, absent monopoly factors. Plaintiff further points out that the same relative results would be reached with the other pictures depending on the difference shown in the comparison.[34]

32. A week of playing time is regarded as consisting of 10 units—each day of the week except Saturday and Sunday is treated as 1 unit; Saturday is treated as 2 units; Sunday is treated as 3 units. Thus, the normal week consists of 10 units. When a general holiday falls in the middle of the week, it is treated as representing 3 units. Such a week thus has a total of 12 units.

33. Def's Ex. 197.

34. "In view of the fact that the gross of 'The Secret Life of Walter Mitty' in NTC was $1,006,069 and of 'Enchantment' $359,825, it would follow that if the Court were to use this comparison as the sole and only measure of impact and damages upon plaintiff, plaintiff received some $62,000 less from NTC ($62 per $1000 as pointed out above) for 'The Secret Life of Walter Mitty' than it ac-

It is further observed that the foregoing figures used as a predicate are not the complete measure of damages for they do not take into accounting the increase in playing time.

b.   There is no dispute concerning the essential facts surrounding the following significant transactions:

In 1945, as the result of complaints by the Distribution Department of Twentieth Century-Fox concerning inadequate film rent from NTC, NTC paid additional film rental of $500,000.   This payment was over-all and made to satisfy demands of the distribution department of the parent company.

Also, in 1947 NTC paid Twentieth Century-Fox an additional amount of $500,000 film rental.

The record further discloses that the payment during 1945 was allocated to individual picture film rental.   Mr. Lundgren, head of the statistical department, testified that the "distribution department maintained that they were entitled to receive more money—more film rental."[35]

The main dispute centered around the fact that sufficient film rental was not paid: *"They wanted to increase the number of percentage situations; they wanted additional percentage pictures played over and above what were being negotiated for; they wanted adjustments in the flat rental prices."*[36]   (This is practically the same plaint made by Goldwyn.)

Defendants, although admitting the salient facts, contend that since it owned all of NTC voting stock, NTC could be required to pay whatever amount it chose as film rental and that the matter of how much or little was paid by NTC as film rental to the parent company is no evidence of a standard of conduct as to what should have been paid to an outside distributor.

The defendants' contentions are not valid and are not borne out by the record.
    Lundgren testified:

"During the years that National Theatres Corporation was a subsidiary of Twentieth Century-Fox Film Corporation, at least during the period National was operated by the Skouras brothers, there was an understanding between the distribution department and the exhibition department that to all intents and purposes there would be arms-length negotiations for film, as much as possible—especially in view of the fact that there were certain contractual obligations with individuals that depended partly upon either contract profits or other types of additional compensation." [37]

Traditionally, the bargaining between the NTC divisions and Twentieth Century-Fox was at arm's length and there was as much bargaining and haggling over the terms as there was with other distributors.[38]

In addition, Charles Skouras and other officers enjoyed manager's contracts which provided for compensation based upon the profits of their respective divisions of NTC.   It is fairly inferable from the record that these gentlemen were not engaged in making gifts to Twentieth Century if it would mean a reduction in their own compensation.   It is further inferable from the record that these executives were not engaged in operating an eleemosynary institution.[39]

---

35.   Tr. 3365.

36.   Tr. 3557;   Cf. Pltf's Reply Br. pp. 168–170.

37.   Tr. 3362;   Pltf's Br. p. 152.

38.   Rhoden, Pltf's Ex. 198.

39.   Carter v. Twentieth Century-Fox Film Corp., supra.

tually received under similar conditions, absent the illegal monopoly of NTC, and some $29,000 less from NTC ($83 per $1000) for 'Enchantment' than plaintiff actually received from non-NTC situations under similar circumstances, but again absent the monopoly factor. The same relative results would be reached with the other pictures, depending on the difference shown in the comparison."

Mindful of their general pattern of conduct, one would not expect them to deal out two payments of $500,000 each without great intra-mural compulsion.

The 1945 payment of $500,000 was spread over six Twentieth Century-Fox pictures, thus increasing the film rental on these pictures to an average of 35.5 percent.

By parity, plaintiff contends that the same basic arguments therein availed of afford a predicate for an additional film rental in excess of $200,000 spread over five Goldwyn pictures.[40]

Again, although the arithmetical foundation does not have the same nicety of calculation as that contained in a balance sheet or profit and loss statement, nevertheless it does afford a trier of fact sufficient predicate upon which to base a finding within the fair intendment of the applicable authorities.

c. Further evidence of damages suffered by plaintiff may be found in the record under the general heading of competitive bidding. This form of negotiation for pictures developed at the conclusion of the Paramount case and served as a means of assuring competition in the industry. During the three years involved in the present case, competitive bidding occurred not only as to plaintiff's pictures in certain instances, but also as to many of the products of defendants and their rivals.[41]

While variations occurred from picture to picture and from season to season, the total result of competitive bidding was to assure producers better film rentals and better play-off time.[42] Thus, despite the fact that the gross admissions per unit— a measure of box office attractiveness— during the several years in question were slightly higher (2%) for pictures sold without competitive bidding than for those sold under such procedure, the actual rental per unit for the latter pictures was higher. The percentage of rental was higher under competitive bidding and the playing time was greater.

In the 1947–48 season defendants paid almost 10% more for pictures purchased on a bid basis and allowed those pictures an average of over 3 units more of playing time. Similarly in the 1948–49 season, the average rental paid for bid pictures was two percent higher than for non-bid pictures and the average unit of playing time exceeded that for non-bid pictures by more than three units. Again in the 1949–50 season, competitive bidding and unit of playing time exceeded that for non-bid pictures. For the three seasons, the average increased rental and additional playing time enjoyed by plaintiff under competitive bid situations in negotiations with defendants resulted in 54% greater revenue for pictures leased under competitive terms than for those rented without competitive bidding.[43]

Mr. McIntyre of RKO, plaintiff's agent, testified that defendants refused to make any commitment as to playing time for plaintiff's pictures when he negotiated with them. Contrast this with the situation arising under competition. Defendants' own witnesses conceded that in many situations, competitive bidding led to higher film rentals and more units of playing time. Nor can this be dismissed as "crisis" conduct. As stated above, defendants themselves presented arguments on behalf of competitive bidding before our Court of Appeal in the Paradise case.[44] They pointed out its

---

40. Pltf's Br. p. 156.

41. See Def's Ex. 215.

42. Tr. 4407, 4408, as supplemented by plaintiff's Exhibits 406 and 407 and analyzed in detailed appendix to plaintiff's brief dealing with individual competitive bidding situations in areas ranging from Compton, Huntington Park, Los Angeles and Inglewood to San Jose, Sacramento and San Francisco. See also, plaintiff's reply brief, opposite p. 127.

43. Pltf's br. pp. 104–116; Tr. 5749, 5753, 5754, 5796; Beggs testimony through Exh. 215.

44. 264 F.2d 602.

advantages and its fairness to producers. The scale on which it was utilized during the years covered by this litigation establish its acceptance by the industry.[45] The thread of the arithmetic story told through this media results in the following conclusions which are inevitably drawn from the record:

1. In competitive bidding there is more playing time.

2. In situations of comparable note the rental or license fee was greater.

While defendants may challenge the specific differential between competitive and non-competitive rentals, they cannot dispute the record which establishes that plaintiff would have received substantially higher rentals for its pictures had they been negotiated on a competitive bid basis. Defendants themselves paid more for the same product when they acquired a picture on a competitive basis.[46] As previously stated, plaintiff would have received in excess of 50% additional rental during the period 1947–50 had competitive bidding been available for disposition of its products.[47]

Consideration should also be given to the testimony of James Mulvey, the president of plaintiff. Mr. Mulvey spent thirty-five years in the industry in various capacities and also had approximately seven years' experience as a trained accountant. We have already alluded to the fact that Judge Murphy was seemingly impressed with his testimony.

Apart from the interest that the witness would necessarily have in the outcome of the controversy and mindful of the fact that expert opinion testimony is very often ingenious [48] and subject to the pressures of partisanship and employ-

ment, nevertheless Mr. Mulvey's testimony is persuasive—again, merely as a base upon which a fact finder could undertake to predicate a reasonable estimate.

Mr. Mulvey's testimony occupied some 700 pages of transcript. He was subjected to lengthy direct and vigorous cross-examination. He testified in finality based upon the Walsh Studies [49] that plaintiff was aggrieved and damaged in the amount of $287,675 as to the five pictures distributed.[50]

Did the plaintiff introduce sufficient relevant economic data from which a court may be able to make an estimate of what the market might have produced absent violation of the antitrust law?

The foregoing general illustrations answer this question in the affirmative. The Court is mindful, however, that the arithmetical observations and conclusions are merely pieces of the general mosaic—not controlling or conclusive as to the specific dollar claim,—and merely serving as elements upon which to predicate the ultimate finding.

d. There are many other facts which are tendered as part of the general accounting picture. Plaintiff has advanced a comparison of "Hans Christian Anderson" (shown in the early '50's) with the results of the pictures released and exhibited during 1947–50.[51]

In addition, plaintiff has advanced other and varied contentions on which damages may be predicated. However, the foregoing transactions, set forth seriatim, are thoroughly grounded in the record and present relevant data upon which reliance may be placed.

In arriving at the amount of damage, it is evident that the result cannot be obtained by applying a formula that

45. See Exh. 215.

46. Cf. Tr. 6005, 6109, 6116–18, 6369.

47. Footnote 43, supra.

48. Judge Murphy stated (Tr. 6478): "Dr. Beggs has done everything but the Indian Rope Trick with his figures * * ".

49. Pltf's Exh. 401.

50. Pltf's Exh. 385.

51. See testimony of Lundgren, pp. 5496–5498.

would operate with the precision that would ordinarily be encountered in a corporate balance sheet or profit and loss statement.

Realizing the difficulties attendant upon such appraisal, our Court of Appeals in Richfield Oil Corp. v. Karseal Corp., supra, 271 F.2d at page 714, observed:

"We do not see much difference between the suggested formula (profits plaintiff would have realized if defendant had marketed product) as an assist in arriving at just and reasonable damages, and a chart placed on a blackboard in a personal injury case, where plaintiff's lawyer outlines his computations as to loss of earnings, pain and suffering, and the various other items of damage. The plaintiff is not required to prove with mathematical certainty the amount of its damage resulting from a defendant's violation of the antitrust laws.

"Story Parchment Co. v. Paterson Parchment Paper Co., supra, 282 U.S. at pages 562–563, 51 S.Ct. at page 250, states:

" ' * * * It is true that there was uncertainty as to the extent of the damages, but there was none as to the fact of damage; and there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage and the measure of proof necessary to enable the jury to fix the amount. The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount * * * '

* * * * * *

"Under all the facts in the case the damages must have a reasonable and fair relationship to the type, extent and period of the restraint applied, the number of outlets affected by the restraint and the kind of product, its price and salability, the profit made on sales, and an estimate of the amount of profit lost by reason of the illegal activities of the defendant. There was here proof of such matters."

As we have it in the case at bar the matter is simplified to the extent that the same parity of reasoning may be applied as in a personal injury case. Conceivably, in the absence of specific evidence of a clear and satisfactory character such a rule or formula would resolve the matter into mere guess or speculation. However, the case at bar provides specific references as hereinabove pointed out, as a basis and criterion upon which to predicate and rationalize the quantum of damage suffered. There is no guess work or speculation involved when we have the various elements and components as carefully and precisely set forth as hereinabove alluded to.

Under the circumstances the sum of $100,000 trebled under Section 4 of the Clayton Act [52] results in a total award of $300,000. This amount equated as to the various elements herein alluded to represents an amount based on relevant data consistent with a fair, just and equitable award. Attorney fees and costs are allowed plaintiff.

52. "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."