# UNITED STATES *v.* GRIFFITH ET AL.

No. 64.   Argued December 15, 1947.—Decided May 3, 1948.

*Robert L. Wright* argued the cause for the United States. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Sonnett, Milton A. Kallis* and *Robert W. Ginnane.*

*Charles B. Cochran* argued the cause for appellees. With him on the brief was *John B. Dudley.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This is a suit brought by the United States in the District Court to prevent and restrain appellees from violating §§ 1 and 2 of the Sherman Act. 26 Stat. 209, as amended, 50 Stat. 693, 15 U. S. C. §§ 1, 2. The District Court, finding there was no violation of the Act in any of the respects charged in the complaint, dismissed the complaint on the merits. 68 F. Supp. 180. The case is here by appeal under § 2 of the Expediting Act of February 11, 1903, 32 Stat. 823, as amended, 15 U. S. C. § 29, and § 238 of the Judicial Code, as amended by the Act of February 13, 1925, 43 Stat. 936, 938, 28 U. S. C. § 345.

The appellees are four affiliated corporations and two individuals who are associated with them as stockholders and officers.[1] The corporations operate (or own stock in

---

[1] Griffith Amusement Co., Consolidated Theatres, Inc., R. E. Griffith Theatres, Inc., Westex Theatres, Inc., H. J. Griffith, and L. C. Griffith. R. E. Griffith, a brother of H. J. and L. C. Griffith, was a defendant, but died while the suit was pending in the District Court and the action was not revived against his estate or personal representative.

corporations which operate) moving picture theatres in Oklahoma, Texas, and New Mexico. With minor exceptions, the theatres which each corporation owns do not compete with those of its affiliates but are in separate towns. In April, 1939, when the complaint was filed, the corporate appellees had interests in theatres in 85 towns. In 32 of those towns there were competing theatres. Fifty-three of the towns (62 per cent) were closed towns, *i. e.* towns in which there were no competing theatres. Five years earlier the corporate appellees had theatres in approximately 37 towns, 18 of which were competitive and 19 of which (51 per cent) were closed. It was during that five-year period that the acts and practices occurred which, according to the allegations of the complaint, constitute violations of §§ 1 and 2 of the Sherman Act.

Prior to the 1938–1939 season these exhibitors used a common agent to negotiate with the distributors for films for the entire circuit.[2] Beginning with the 1938–1939 season one agent negotiated for the circuit represented by two of the corporate appellees, and another agent negotiated for the circuit represented by the other two corporate appellees. A master agreement was usually executed with each distributor covering films to be released by the distributor during an entire season.[3] There were variations among the master agreements. But in the main they provided as follows: (a) They lumped together towns in which the appellees had no competition and towns in which there were competing

___

[2] The circuit includes the four corporate appellees and their affiliated exhibitors. When less than the full ownership of a theatre was acquired, the contract would provide that the buying and booking of films was exclusively in the hands of the Griffith interests. ·

[3] The agreement negotiated by the common agent would be executed between a distributor and each of the corporate appellees or between a distributor and an individual exhibitor.

theatres. (b) They generally licensed the first-run exhibition in practically all of the theatres in which appellees had a substantial interest of substantially all of the films to be released by the distributor during the period of a year.[4] (c) They specified the towns for which second runs were licensed for exhibition by appellees, the second-run rental sometimes being included in the first-run rental. (d) The rental specified often was the total minimum required to be paid (in equal weekly or quarterly installments) by the circuit as a whole for use of the films throughout the circuit, the appellees subsequently allocating the rental among the theatres where the films were exhibited. (e) Films could be played out of the order of their release, so that a specified film need not be played in a particular theatre at any specified time.[5]

The complaint charged that certain exclusive privileges which these agreements granted the appellee exhibitors over their competitors unreasonably restrained competition by preventing their competitors from obtaining enough first- or second-run films from the distributors [6] to operate successfully. The exclusive privileges charged as violations were preemption in the selection of films and the receipt of clearances over competing theatres. It

---

[4] There were a few franchise agreements covering films to be released by a distributor during a term of years, usually for three years and in one instance for five years.

The theatres of appellees in Oklahoma City were second, not first, run theatres.

[5] The privilege was frequently conditioned on the playing of, or paying for, a designated quantity of the film obligation during stated portions of the season.

[6] Those are the eight major film distributors who originally were defendants. The charge that these distributors conspired with each other was eliminated from the complaint and they were dismissed as defendants by stipulation or on motion of appellant. But the charge that each of the distributors had conspired with the appellee exhibitors was retained.

also charged that the use of the buying power of the entire circuit in acquiring those exclusive privileges violated the Act.

The District Court found no conspiracy between the appellee exhibitors or between them and the distributors, which violated the Act. It found that the agreements under which films were distributed were not in restraint of trade; that the appellees did not monopolize or attempt to monopolize the licensing or supply of film for first run or for any subsequent run; that the appellees did not conspire to compel the distributors to grant them the exclusive privilege of selecting films before the films were made available to any competing exhibitor; that there was no agreement between defendants and distributors granting defendants unreasonable clearances; that the appellees did not compel or attempt to compel distributors to grant them privileges not granted their competitors or which gave them any substantial advantage over their competitors; and that appellees did not condition the licensing of films in any competitive situation on the licensing of such films in a non-competitive situation, or *vice versa.*

The appellant introduced evidence designed to show the effect of the master agreements in some twenty-odd competitive situations. The District Court made detailed findings on this phase of the case to the effect that difficulties which competitors had in getting desirable films after appellee exhibitors entered their towns, the inroads appellees made on the business of competitors, and the purchases by appellees of their competitors were not the result of threats or coercion nor the result of an unlawful conspiracy, but solely the consequence of lawful competitive practices.

In *United States* v. *Crescent Amusement Co.,* 323 U. S. 173, a group of affiliated exhibitors, such as we have in the present case, were found to have violated §§ 1 and 2 of the Sherman Act by the pooling of their buying power

and the negotiation of master agreements similar to those we have here. A difference between that case and the present one, which the District Court deemed to be vital, was that in the former the buying power was used for the avowed purpose of eliminating competition and of acquiring a monopoly of theatres in the several towns, while no such purpose was found to exist here. To be more specific, the defendants in the former case through the pooling of their buying power increased their leverage over their competitive situations by insisting that they be given monopoly rights in towns where they had competition, else they would give a distributor no business in their closed towns.

It is, however, not always necessary to find a specific intent to restrain trade or to build a monopoly in order to find that the anti-trust laws have been violated. It is sufficient that a restraint of trade or monopoly results as the consequence of a defendant's conduct or business arrangements. *United States* v. *Patten,* 226 U. S. 525, 543; *United States* v. *Masonite Corp.,* 316 U. S. 265, 275. To require a greater showing would cripple the Act. As stated in *United States* v. *Aluminum Co. of America,* 148 F. 2d 416, 432, "no monopolist monopolizes unconscious of what he is doing." Specific intent in the sense in which the common law used the term is necessary only where the acts fall short of the results condemned by the Act. The classical statement is that of Mr. Justice Holmes speaking for the Court in *Swift & Co.* v. *United States,* 196 U. S. 375, 396:

> "Where acts are not sufficient in themselves to produce a result which the law seeks to prevent—for instance, the monopoly—but require further acts in addition to the mere forces of nature to bring that result to pass, an intent to bring it to pass is necessary in order to produce a dangerous probability that it will happen. *Commonwealth* v. *Peaslee,* 177 Mas-

*sachusetts,* 267, 272. But when that intent and the consequent dangerous probability exist, this statute, like many others and like the common law in some cases, directs itself against that dangerous probability as well as against the completed result."

And see *United States* v. *Aluminum Co. of America, supra,* pp. 431–432. And so, even if we accept the District Court's findings that appellees had no intent or purpose unreasonably to restrain trade or to monopolize, we are left with the question whether a necessary and direct result of the master agreements was the restraining or monopolizing of trade within the meaning of the Sherman Act.

Anyone who owns and operates the single theatre in a town, or who acquires the exclusive right to exhibit a film, has a monopoly in the popular sense. But he usually does not violate § 2 of the Sherman Act unless he has acquired or maintained his strategic position, or sought to expand his monopoly, or expanded it by means of those restraints of trade which are cognizable under § 1. For those things which are condemned by § 2 are in large measure merely the end products of conduct which violates § 1. *Standard Oil Co.* v. *United States,* 221 U. S. 1, 61. But that is not always true. Section 1 covers contracts, combinations, or conspiracies in restraint of trade.[7] Section 2 is not restricted to conspiracies or combinations to monopolize [8] but also makes it a crime for any person to monopolize or to attempt to monopolize any part of

---

[7] Section 1 provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. . . ."

[8] Section 2 provides: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor . . . ."

interstate or foreign trade or commerce. So it is that monopoly power, whether lawfully or unlawfully acquired, may itself constitute an evil and stand condemned under § 2 even though it remains unexercised.[9] For § 2 of the Act is aimed, *inter alia,* at the acquisition or retention of effective market control. See *United States* v. *Aluminum Co. of America,* 148 F. 2d 416, 428, 429. Hence the existence of power "to exclude competition when it is desired to do so" is itself a violation of § 2, provided it is coupled with the purpose or intent to exercise that power. *American Tobacco Co.* v. *United States,* 328 U. S. 781, 809, 811, 814. It is indeed "unreasonable, *per se,* to foreclose competitors from any substantial market." *International Salt Co.* v. *United States,* 332 U. S. 392, 396. The anti-trust laws are as much violated by the prevention of competition as by its destruction. *United States* v. *Aluminum Co. of America, supra.* It follows *a fortiori* that the use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor, is unlawful.

A man with a monopoly of theatres in any one town commands the entrance for all films into that area. If he uses that strategic position to acquire exclusive privileges in a city where he has competitors, he is employing his monopoly power as a trade weapon against his competitors. It may be a feeble, ineffective weapon where he has only one closed or monopoly town. But as those towns increase in number throughout a region, his monopoly power in them may be used with crushing effect on competitors in other places.[10] He need

---

[9] So also a conspiracy to monopolize violates § 2 even though monopoly power was never acquired. *American Tobacco Co.* v. *United States,* 328 U. S. 781, 789.

[10] It was said in *United States* v. *United States Steel Corp.,* 251 U. S. 417, 451, that mere size is not outlawed by § 2. But size is of course an earmark of monopoly power. Moreover, as stated by

not be as crass as the exhibitors in *United States* v. *Crescent Amusement Co., supra,* in order to make his monopoly power effective in his competitive situations. Though he makes no threat to withhold the business of his closed or monopoly towns unless the distributors give him the exclusive film rights in the towns where he has competitors, the effect is likely to be the same where the two are joined. When the buying power of the entire circuit is used to negotiate films for his competitive as well as his closed towns, he is using monopoly power to expand his empire. And even if we assume that a specific intent to accomplish that result is absent, he is chargeable in legal contemplation with that purpose since the end result is the necessary and direct consequence of what he did. *United States* v. *Patten, supra,* p. 543.

The consequence of such a use of monopoly power is that films are licensed on a non-competitive basis in what would otherwise be competitive situations. That is the effect whether one exhibitor makes the bargain with the distributor or whether two or more exhibitors lump together their buying power, as appellees did here. It is in either case a misuse of monopoly power under the Sherman Act. If monopoly power can be used to beget monopoly, the Act becomes a feeble instrument indeed. Large-scale buying is not, of course, unlawful *per se.* It may yield price or other lawful advantages to the buyer. It may not, however, be used to monopolize or to attempt to monopolize interstate trade or commerce. Nor, as we hold in *United States* v. *Paramount Pictures, Inc., post,* p. 131, may it be used to stifle competition by denying competitors less favorably situated access to the market.

---

Justice Cardozo, speaking for the Court in *United States* v. *Swift & Co.,* 286 U. S. 106, 116, "size carries with it an opportunity for abuse that is not to be ignored when the opportunity is proved to have been utilized in the past."

Appellees were concededly using their circuit buying power to obtain films. Their closed towns were linked with their competitive towns. No effort of concealment was made as evidenced by the fact that the rental specified was at times the total minimum amount required to be paid by the circuit as a whole. Monopoly rights in the form of certain exclusive privileges were bargained for and obtained. These exclusive privileges, being acquired by the use of monopoly power, were unlawfully acquired. The appellees, having combined with each other and with the distributors to obtain those monopoly rights, formed a conspiracy in violation of §§ 1 and 2 of the Act. It is plain from the course of business that the commerce affected was interstate. *United States* v. *Crescent Amusement Co., supra,* pp. 180, 183–184.

What effect these practices actually had on the competitors of appellee exhibitors or on the growth of the Griffith circuit we do not know. The District Court, having started with the assumption that the use of circuit buying power was wholly lawful, naturally attributed no evil to it and thus treated the master agreements as legitimate weapons of competition. Since it found that no competitors were driven out of business, or acquired by appellees, or impeded in their business by threats or coercion, it concluded that appellees had not violated the Sherman Act in any of the ways charged in the complaint. These findings are plainly inadequate if we start, as we must, from the premise that the circuit buying power was unlawfully employed. On the record as we read it, it cannot be doubted that the monopoly power of appellees had some effect on their competitors and on the growth of the Griffith circuit. Its extent must be determined on a remand of the cause. We remit to the District Court not only that problem but also the fashioning of a decree which will undo as near as may be the wrongs that were done and prevent their recurrence in the future. See *United*

*States* v. *Crescent Amusement Co., supra*, pp. 189–190; *Schine Chain Theatres* v. *United States, post*, p. 110; *United States* v. *Paramount Pictures, Inc., post*, p. 131.

*Reversed.*

MR. JUSTICE FRANKFURTER dissents, substantially for the reasons set forth in the opinion of the District Court, 68 F. Supp. 180.

MR. JUSTICE MURPHY and MR. JUSTICE JACKSON took no part in the consideration or decision of this case.