**UNITED STATES of America**

v.

**Thomas J. GILLEN.**

**Crim. No. 77–72–2.**

United States District Court,
M. D. Pennsylvania.

June 21, 1978.

888

John Hughes, Roger L. Currier, and Warren Marcus, Philadelphia, Pa., for the United States Government.

Bernard J. Brown, Carbondale, Pa., for defendants.

## MEMORANDUM

HERMAN, District Judge.

The Defendant, Thomas J. Gillen, along with James J. Tedesco, was charged with engaging in a conspiracy to fix, stabilize and maintain prices of anthracite coal in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act. (15 U.S.C. 1). Gillen elected to be tried by the Court without a jury and the trial began on January 3, 1978 and continued through January 10.

By the first of March the parties' briefs and suggested findings had been filed, oral argument was then had and the case is now ripe for decision.

From the record the Court makes the following.

## FINDINGS OF FACT

1. The term "circulars" as used by the representatives of anthracite coal companies: Blue Coal Corporation; Lehigh Navigation-Dodson Company; Lehigh Valley Coal Sales Company, Inc.; Susquehanna Coal Company and Glen Burn Colliery, Inc., means the price lists for the sale of anthracite coal to line dealers, the dealers who are not located in the immediate vicinity of the colliery and who are generally shipped coal by rail or truck, many of whom are located in states other than Pennsylvania.

2. During the period between 1961 through November of 1973, Blue Coal Corporation;[1] Lehigh Navigation-Dodson Company; Glen Burn Colliery, Inc.; Susquehanna Coal Company and Reading Anthracite Coal Company issued such circulars three or four times a year. (Exhibits G–217 through 625.)

3. Prior to the issuance of the circulars, sales representatives, including Carl J. Tomaine for Blue Coal Corporation, (after 1968); Charles W. Dilley for Lehigh Navigation-Dodson Company; Joseph A. Frank for Lehigh Valley Coal Sales Company, Inc.; Eugene J. Bourger for Susquehanna Coal Company and later for Glen Burn Col-

liery, Inc., and William R. Dougan for Reading Anthracite Coal Company met together in the Middle District of Pennsylvania to discuss the coal prices that would appear on the circulars. N.T. 33, 34, 39, 119, 120, 209–211, 289–294, 374–379.

4. During such meetings the sales representatives would reach a tentative agreement concerning the prices to be charged by the companies they represented for the various sizes of coal as reported on the circulars; and concerning the issuance of such circulars; the date of issue; effective date, and which company would first issue its circular. N.T. 39, 120, 209, 210, 291, 377.

5. After such meetings the sales representatives reported to their superiors who approved the agreements and then generally, communicating with each other by telephone, the said representatives confirmed the agreement. N.T. 39, 40, 212, 215, 218, 380, 381.

6. Tomaine, sales representative for Blue Coal Corporation, generally during the period from 1968 through 1973 reported what occurred at these meetings to his superior Thomas J. Gillen, then President of the Company. N.T. 374–379.

7. Thomas J. Gillen, Defendant, knew and approved of the actions of Tomaine in the agreements reached at these meetings. N.T. 41, 42, 381.

8. Tomaine by telephone on occasion later confirmed with the others the agreement that had been tentatively reached at the meetings. N.T. 217.

9. Following the said telephone communications between the sales representatives described above, the anthracite companies including Blue Coal would issue circulars conforming to the agreements. N.T. 120–124; 212, 213, 217, 295; 378–382; G.Ex. 212 et seq.; particularly 422, 428, 434, 438, 443, 449, 455, 461, 467, 474, 480, 487, 494.

10. In the winter of 1966–1967 a meeting was held at Brutico's Restaurant, Old Forge, Pennsylvania, attended by about 15 persons including the Defendant, Thomas J.

---

1. Prior to 1966, Blue Coal was Glen Alden.

Gillen, Tomaine, Dilley, Bourger, Dougan, Frank, as well as James Tedesco, President of Lehigh Valley Coal Sales Company, Inc., Ivor Williams, then President of Blue Coal Corporation and William Moore, President of Susquehanna Coal Company. N.T. 125–127; 42–44; 268–270; 598.

11. At the meeting at Brutico's the parties agreed to try to get a better price for their coal, something near the circular price. N.T. 45, 128, 129, 130, 271.

12. The Defendant, Thomas J. Gillen, was part owner of Blue Coal Corporation, a co-conspirator, from 1966 until November 26, 1973 and was President and Chief Executive Officer of the company from 1968 until November 26, 1973. N.T. 496, 497, 500, 501, 551.

13. The Defendant, as President and Chief Executive Officer of Blue Coal Corporation, had "overall authority" over all departments of the company. N.T. 560.

14. The said Defendant, as President and Chief Executive Officer of the Blue Coal Corporation had, at all times pertinent to the issues here, the final pricing authority for the sale of coal by the company. N.T. 619.

15. The said Defendant, as President and Chief Executive Officer of the Blue Coal Corporation, did in fact participate with Carl Tomaine in making pricing decisions in the sale of coal by Blue Coal Corporation during the time pertinent to the issues here. N.T. 564–566. Coal was sold by Blue Coal to line dealers generally at the prices quoted in the circulars. N.T. 150, 190.

16. Prior to the meetings of the sales representatives described in Finding of Fact No. 3, at meetings of the Anthracite Committee on occasion Gillen, Fauzio and other coal producers suggested that the sales representatives of the various companies should get together and begin thinking about the circulars. N.T. 41, 42.

17. During each year from 1968 through October 1973, Blue Coal Corporation sold and shipped from Pennsylvania to line dealers located outside of Pennsylvania substantial quantities of anthracite coal in a continuous and uninterrupted flow of interstate commerce. N.T. 7.

18. During each year from 1968 through October 1973 Lehigh Valley Coal Sales Company, Inc., Glen Burn Colliery, Inc. and Lehigh Navigation-Dodson Company, also sold and shipped from Pennsylvania to line dealers located outside of Pennsylvania substantial quantities of anthracite coal. N.T. 184–187 and 229; 93; 267–268.

19. Circulars issued as herein described were mailed from the Middle District of Pennsylvania to line dealers in states other than Pennsylvania. These circulars contained the prices at which the anthracite coal was sold to said dealers. N.T. 97; 192–193.

## DISCUSSION

 There are three elements that must be established by the Government before the Defendant can be found guilty of the offense charged. It must be established, first that there was a conspiracy, second that the conspiracy unreasonably restrained interstate commerce and finally that the Defendant was a member of that conspiracy.[2]

 The evidence establishes a conspiracy among the major anthracite coal companies in north eastern Pennsylvania, including Blue Coal Corporation, to fix, stabilize and maintain the prices of anthracite coal at least for the period between 1966 and 1973.

A brief history of the operation of the conspiracy follows.

2. Section 1 of the Sherman Act, as it existed at the time of the occurrence of the facts here in issue provided in pertinent part:

"Every contract, combination . . . or conspiracy, in restraint of trade or commerce among the several states . . . . is declared to be illegal . . . Every person who shall make any contract or engage in any combination or conspiracy declared . . . to be illegal shall be deemed guilty of a misdemeanor . . . ."

Virtually all anthracite coal produced in the United States during the period in issue here was mined and processed in Pennsylvania. It was estimated that total sales per year was in excess of 50 million dollars. This coal is marketed in sizes ranging from the largest egg through stove, pea, buckwheat, rice to barley, the smallest. Most sizes may be used for home heating and many also are used by commercial and industrial establishments.

During all or part of the period covered by the indictment executives of the major anthracite organizations met monthly as the Anthracite Producers Advisory Board to consider and recommend the total anthracite production quota as provided in the federally authorized Production Control Plan for the Anthracite Industry. Four or five times a year, at the conclusion of the meeting of the Advisory Board, the parties in attendance discussed prices reaching tentative agreements on the price each company represented would charge for the various sizes of coal for the ensuing months. In almost all instances all companies agreed to the same price.

Representatives of Blue Coal Corporation, Glen Burn Colliery, Inc., Greenwood Stripping Corporation, Lehigh Navigation-Dodson Company, Lehigh Valley Coal Sales Company, Inc. and Reading Anthracite Coal Company were generally those who participated in these "after meetings". These companies, as well as William R. Dougan for Reading Anthracite Coal Company, Joseph A. Frank for Lehigh Valley Coal Sales Company and Carl J. Tomaine for Blue Coal were named in the indictment as co-conspirators.[3]

The tentative agreements on price were then taken up with the superiors of the persons in attendance at the "after meetings" and when confirmed, as they generally were, anthracite price circulars were issued by the various companies.

These anthracite price circulars are cards or letters printed by the co-conspirator companies which set forth, among other things, published prices of various sizes of anthracite coal. These circulars were issued at various times during a year to certain customers for the purpose of advising them of price changes. A substantial portion of these customers are coal dealers located outside of Pennsylvania.

Traditionally, and for many years during the period covered by the indictment, the price circulars issued in the spring of each year reduced the published prices as an inducement for dealers to purchase coal in the off-season. Thereafter, usually beginning in about June or July, the published prices of anthracite were increased in three or four stages to cover the spring reduction and to raise prices generally during the burning season.

The sessions which occurred after Advisory Board meetings generally were held a month or so prior to the time circulars would be issued. At these sessions, the conspirators present reached agreement on the price levels which would be listed by their respective companies in the forthcoming circulars. It was understood by the men at the meetings that some of the prices printed by one or more of them could, at times, vary somewhat from the others if that were necessary to compensate for a peculiar market or inventory situation or other problems which a producing company might be encountering. In addition, agreement was reached as to the timing of the circular price change as well as the company which would initiate the change.

These pricing discussions were held prior to the issuance of every price circular and no mention of them was ever made in the official minutes of the Advisory Board. The price discussions were not authorized by the Production Control Plan and were no part of the Advisory Board's function.

---

3. All of those named as co-conspirators except William R. Dougan, against whom the indictment was dismissed because of his health, previously entered pleas of nolle contendere to an indictment in this District charging the same conspiracy at Criminal No. 76–149.

James J. Tedesco, President of Lehigh Valley Coal Sales Company, Inc., a co-defendant in the instant case also pled nolle contendere.

Following these "after meetings" some of the members of the Advisory Board would inform their superiors of the nature and content of the price discussions. At times, after their superiors had been consulted, certain Advisory Board members would then telephone other conspirators to verify that their companies would issue price circulars in accordance with the agreement reached at the "after meeting".

Carl J. Tomaine, named as an unindicted co-conspirator in paragraph 2 of the indictment, was Vice President for Domestic and Retail Sales for Blue Coal Corporation from approximately 1966 to May 1974. During at least that period of time and during each of those years he was Blue Coal's only representative at Advisory Board meetings and represented Blue Coal in the price-fixing meetings which followed certain Advisory Board meetings.

While the circular represented the published price for the sizes of anthracite coal listed thereon, and the price at which the companies, including Blue Coal, actually sold the coal, it did not *always* represent the actual selling price. At times, the conspirators sold above the circular price. At other times, they sold below the circular price. When sales were made below the circular price, however, the circular price was used as the level from which discounts were determined.

During one period of particularly heavy discounting, in the winter of 1966–1967, a meeting was held by the representatives of anthracite companies at Brutico's Restaurant in Old Forge, Pennsylvania. Defendant Gillen was present at this meeting. Discussion at the meeting, in which Gillen participated, centered on the need to discontinue discounting from circular price and the need to generally raise the selling price of anthracite for all producer companies. Following general agreement on these aims at the meeting, discounting gradually began to abate and selling prices began to come more in line with the agreed upon circular prices.

The circulars from all companies showing the similarity in price for each company were received into evidence as was the handwritten tabulation of the circular prices for 1967 through 1973 for all six major anthracite companies. This tabulation (G. 204–210) was kept by Charles W. Dilley, of Lehigh Navigation-Dodson Company as he testified at page 296 N.T.:

"(A) These are a record of the prices, all the major anthracite producing companies and they are from my own file, my own deskfile in my handwriting. And they list the prices of each of the companies that published a circular in the year 1967 through the year 1973. These were made up by me and they were made up, each entry as to what a company's price was at a certain time was entered by me when their price circular was received and in hand."

■ While the evidence in a conspiracy case need not show an express or formal agreement or that the members by words spoken or written stated between themselves what their objective or purpose was to be or the details thereof, or the means by which the object or purpose was to be accomplished, *U. S. v. Paramount Pictures,* 334 U.S. 131, 142, 68 S.Ct. 915, 92 L.Ed. 1260 (1948), the evidence in this case is overwhelming that a conspiracy was indeed knowingly formed and that the six corporate co-conspirators as well as Frank and Tomaine were members of it. See *Nash v. U. S.,* 229 U.S. 373, 378, 33 S.Ct. 780, 782, 57 L.Ed. 1232, 1236 (1912) where Justice Holmes stated ". . . the Sherman Act punishes the conspiracies, at which it is aimed on the common-law footing,—that is to say, it does not make the doing of any act other than the act of conspiring a condition of liability." See also *U. S. v. Paramount Pictures Inc.,* 334 U.S. 131, 142, 68 S.Ct. 915, 92 L.Ed. 1260 (1948).

In *Duplex Printing Press Co. v. Deering,* 254 U.S. 443, 465, 41 S.Ct. 172, 176, 65 L.Ed. 349, 356 (1920) in speaking of the Sherman Act after quoting that part of Section 1 of the Act applicable to the illegality of conspiracy thereunder, goes on to say:

"The accepted definition of a conspiracy is, a combination of two or more

persons by concerted action to accomplish a criminal or unlawful purpose or to accomplish some purpose not in itself criminal or unlawful by criminal or unlawful means."

See also *U. S. v. Perlstein,* 126 F.2d 789 (3d Cir. 1942).

■ There is no need to show any specific intent to restrain trade if a conspiracy to fix prices is shown to exist in an industry, the very nature of which involves large shipments of coal from this District in Pennsylvania to other states. See *U. S. v. Griffith,* 334 U.S. 100, 105, 68 S.Ct. 941, 944, 92 L.Ed. 1236, 1242 (1947); *U. S. v. Patten,* 226 U.S. 525, 543, 33 S.Ct. 141, 145, 57 L.Ed. 333, 342 (1912). In the *Patten* case it was said:

". . . the conspirators must be held to have intended the necessary and direct consequences of their acts, and cannot be heard to say the contrary. In other words, by purposely engaging in a conspiracy which necessarily and directly produces the result which the statute is designed to prevent, they are, in legal contemplation, chargeable with intending that result."

■ "Proof that there was a conspiracy, that its purpose was to raise prices, and that it caused or contributed to a price rise is proof of the actual consummation or execution of a conspiracy under § 1 of the Sherman Act." *U. S. v. Socony-Vacuum Oil Co.,* 310 U.S. 150 at 219, 60 S.Ct. 811 at 842, 84 L.Ed. 1129 at 1166 (1939).

■ "And the amount of interstate or foreign trade involved is not material (*W. W. Montague & Co. v. Lowrey,* 193 U.S. 38, 24 S.Ct. 307, 48 L.Ed. 608) since § 1 of the Act brands as illegal the character of the restraint not the amount of commerce affected. *Steers v. U. S.* (CCA 6th) 192 F. 1, 5; *Patterson v. U. S.* (CCA 6th) 222 F. 599, 618, 619." Footnote 59, *Socony-Vacuum Oil Co.*

We come now to consider the last part of § 1 of the Act (fn. 1 supra) to determine whether or not the Defendant was a member of the conspiracy as charged in the indictment. We conclude that he was.

The Defendant acknowledges in his brief that "There seems to be little doubt that the sales people conspired . . ." but argues that *he* did not "knowingly and intentionally participate in the conspiracy". He further testified that during his entire life in the coal business he was a production man and not familiar with the selling phase of the business. He testified that Tomaine, his sales representative at the price-fixing meetings, had full authority to determine at what price Blue Coal would sell the various grades of coal and that he, Tomaine, never told him (the Defendant) that at these meetings the persons attending agreed to "fix" the coal prices. He further argues that he did not know that the persons at the meetings had so agreed and that he never became a party to the conspiracy. We can agree with the Defendant as argued in his brief that the testimony of accomplices should be viewed with suspicion but we do not believe that Tomaine had an "ax to grind" in testifying as he did at page 468 N.T. and we conclude that his credibility was good.

Q. Did you ever explain to him [the Defendant] that you were up there *agreeing* on prices?

A. I explained to him that we were up there *discussing* prices and what we were going to do for the coming circular whether there was an increase or decrease.

Q. You told them you were *discussing* prices?

A. And we *agreed* to go along on certain prices, yes, sir.

Q. And you told them that you were— these were the prices that you were going to charge at Blue Coal?

A. Yes, sir." (emphasis added)

■ We can agree with the Defendant that before he can be found guilty of the conspiracy charged in the indictment it must be shown beyond a reasonable doubt that he knew of the existence of the conspiracy and that he knowingly participated in it. *U. S. v. Griffith,* supra; *U. S. v. Champion International Corp.,* 557 F.2d

1270 (9th Cir. 1977) but the Government need not show any specific intent under the Sherman Act, *U. S. v. Patten,* supra.

■ The knowledge of the Defendant, and his participation in the conspiracy need not be shown by direct evidence, although it seems to the Court that direct evidence here does establish beyond a reasonable doubt such knowledge and participation, but circumstantial evidence would be sufficient to convict.

The testimony of Tomaine that from 1968 through 1973 he regularly attended the "after meetings"; (corroborated by the others attending the "after meetings") that whenever Defendant was available he discussed these meetings with him telling him of the proposed price increases or decreases of all the companies; that Defendant would say "do whatever you think is right or shrug his shoulders", is strong indication that Defendant knew for some years of the existence of the conspiracy and participated in it.

The testimony concerning the meeting at Brutico's (Findings 10 & 11) at which Defendant was an active participant discussed earlier herein is further indication that he took an active part in the conspiracy. Indeed, the Defendant acknowledged that Tomaine told him that prices were *discussed* at the "after meetings" and that the members were going to take some action thereon, but he argues that Tomaine never told him that they had *agreed* to *fix* the prices. *Socony Oil,* supra, holds that prices are fixed when they are agreed upon.

The circumstantial evidence also points strongly to the fact that the Defendant was a knowing participant. The conspiracy was formed as early as 1961 but for our purposes here it continued from 1966–1967,[4] and from 1968 through 1973 Blue Coals' Vice President in Charge of Domestic Sales, Tomaine, attended the meetings regularly, conferred with the Defendant on a regular basis. Defendant was during this period the executive officer of the company and

admittedly had the final say on pricing and he authorized Tomaine to issue the price circulars.

■ A corporate officer is subject to prosecution under Section 1 of the Sherman Act if he authorizes or helps in the perpetration of the crime. *U. S. v. Wise,* 370 U.S. 405, 82 S.Ct. 1354, 8 L.Ed.2d 590 (1962).

■ We have considered all of the testimony and the exhibits, have assessed the credibility of all the witnesses, the character and reputation evidence put in by stipulation and after considering all of these matters we have arrived at the following.

## CONCLUSIONS OF LAW

1. Beginning as early as 1961 and continuing through November 1973, there existed a conspiracy in the Middle District of Pennsylvania to fix, stabilize and maintain prices of anthracite coal as alleged in the indictment.

2. Blue Coal Corporation, Glen Burn Colliery, Inc., Greenwood Stripping Corporation, Lehigh Navigation-Dodson Company, Lehigh Valley Coal Sales Company, Inc., Reading Anthracite Coal Company, William R. Dougan, Joseph A. Frank, Carl J. Tomaine and James J. Tedesco were co-conspirators in the conspiracy charged in the indictment.

3. This conspiracy unreasonably restrained interstate commerce.

4. This conspiracy was carried out in part within the Middle District of Pennsylvania.

5. The Defendant was a knowing participant in the conspiracy from 1966 to November 26, 1973.

6. The Defendant is guilty of the offense charged in the indictment.

4. In 1966 Defendant, while not President of Blue Coal, had a substantial stock interest in the company and attended the Brutico's meetings as one of the owners.