UNITED STATES of America

v.

Thomas J. GILLEN, Appellant.

No. 78–2082.

United States Court of Appeals,
Third Circuit.

Argued Feb. 12, 1979.

Decided May 8, 1979.

J. Shane Creamer (argued), Peter Goldberger, Carroll, Creamer, Carroll & Duffy, Philadelphia, Pa., for appellant.

John H. Shenefield, Asst. Atty. Gen., Barry Grossman, Daniel J. Conway (argued), Attys., Dept. of Justice, Washington, D. C., for appellee; John J. Hughes, Warren Marcus, Roger L. Currier, Attys., Dept. of Justice, Philadelphia, Pa., of counsel.

Before ALDISERT, ADAMS and HIGGINBOTHAM, Circuit Judges.

OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

The appellant, Thomas J. Gillen, was found guilty of conspiring to fix prices in

violation of Section 1 of the Sherman Act. 15 U.S.C. § 1. He argues that the district court erred in not making specific findings on intent and that the evidence is insufficient to support the judgment of conviction. We disagree and affirm.

### I.

Gillen was charged, along with James J. Tedesco, with conspiring to fix, stabilize and maintain prices of anthracite coal in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act from 1966 through 1973.[1] The companies named in the indictment were engaged in the mining, processing and marketing of anthracite coal and were among its major producers and sellers in the United States.[2] Substantial quantities of anthracite coal were sold and shipped to customers located outside of Pennsylvania.

From 1961 through November, 1973, the Anthracite Producers Advisory Board, composed of representatives of the major anthracite organizations, met monthly to consider and recommend the total anthracite production quota as provided in the federally authorized Production Control Plan for the Anthracite Industry. Four or five times a year, after adjournment of the Advisory Board meetings, the same company representatives who constituted the Advisory Board would discuss and reach tentative agreements on the prices each represented company would charge for the various sizes of coal for the ensuing months.[3] In addition, agreements were reached at these so-called "after meetings" on the timing of the price change as well as the company to initiate the change. After the tentative agreement was reached, the representatives would report to their superiors for their approval. When approved, as they generally were, anthracite price circulars were issued by the companies.[4] These circulars which were issued three or four times a year were price lists for the sale of coal to line dealers.[5] These line dealers were dealers who were not located in the immediate vicinity of the colliery and who generally received coal shipments by rail or truck.

Gillen became president of Blue Coal Corporation in 1967 and continued as such until late 1973. He was also a part owner of Blue Coal from 1966 until November 26, 1973. The government's chief witness, Carl Tomaine, was Blue Coal's vice president in charge of domestic and retail sales from 1968 through 1973. The court below found that Tomaine as sales representative for Blue Coal reported what occurred at the

1. Tedesco pleaded nolo contendere. Six corporations and three individuals were also named in the indictment as co-conspirators: Blue Coal Corporation, Glen Burn Colliery, Inc., Greenwood Stripping Corporation, Lehigh-Navigation-Dodson Company, Lehigh Valley Coal Sales Company, Inc., Reading Anthracite Coal Company, William R. Dougan, Joseph A. Frank, and Carl J. Tomaine. Each of the companies and two of the individuals named in the indictment as co-conspirators pleaded nolo contendere in a related case. M.D.Pa.Crim. No. 76–149. The case against one of the individuals was dismissed because of his poor health.

2. Virtually all anthracite coal produced in the United States during the period in issue, 1961 through November, 1973, was mined and processed in Pennsylvania. It was estimated that total sales per year exceeded fifty million dollars.

3. These "after meetings" were held a month or so prior to the time price circulars would be issued. No mention of these price discussions was ever made in the official minutes of the Advisory Board. These "after meetings" were not authorized by the Production Control Plan and were not part of the Advisory Board's function.

4. "In almost all instances all companies agreed to the same price." District Court Memorandum of Decision at 5–6. It was understood, however, that some of the prices printed by one or more of them could, at times, vary somewhat from the others if necessary to compensate for a peculiar market or inventory situation or other problems that a producing company might be encountering.

5. The circular represented the published price for the sizes of coal listed thereon, and the prices at which the companies actually sold it. At times, however, the companies sold above or below the circular price. When sales were made below the circular price, however, the circular price was used as the level from which discounts were determined.

"after meetings" to Gillen, who was then president of the company. It found further that Gillen knew and approved of the actions of Tomaine in the agreements reached at these meetings. It concluded that Gillen was a knowing participant in the price-fixing conspiracy from 1966 to November 26, 1973. Gillen was sentenced to a suspended prison term of six months, a $35,000 fine and two years probation.

## II.

### A. PRECEPTS OF LAW

With commendable vigor, Gillen's present counsel contends that "The district court erred in holding that intent is not an element of a criminal price-fixing conspiracy charge." The validity of appellant's argument depends on whether the United States Supreme Court in *United States v. United States Gypsum Co.,* 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978) changed the law of more than four decades on proof of intent in a price-fixing conspiracy case. *Gypsum* was decided a week after the trial judge filed his Memorandum of Decision containing findings of fact and verdict of guilty.[6] We must nevertheless consider *Gypsum* because we must apply the law in effect as of the time we render this decision. *Bradley v. School Board of City of Richmond,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974).

In determining the applicability of *Gypsum* to the instant case we have within the "hierarchy of legal precepts" a situation where "the rule of law is clear and the sole question is application to the facts at bar." Aldisert, *Writing Judicial Opinions,* III–2 (1979) (unpublished manuscript); *See also* Aldisert, *The Judicial Process,* 59–71 (1976).

### B. THE DIFFERENT FACTUAL SITUATIONS

At issue in *Gypsum* was whether an exchange of price information for purposes of compliance with the Robinson-Patman Act, 15 U.S.C. § 13, was exempt from Sherman

Act scrutiny. The defendants claimed that the purposes of these price exchanges were to permit them to take advantage of the "meeting competition" defense of Section 2(b) of the Robinson-Patman Act and to prevent customer fraud. The government alleged that this system of interseller price verification had the effect of stabilizing the price of gypsum board in violation of section 1 of the Sherman Act. The Court concluded that interseller price verification could not be used to establish a good faith defense under Section 2(b) by sellers with "lying buyers."

Thus *Gypsum* was not a situation where the parties agreed that a certain price would be charged; at most the parties sought information on what price had been or was being charged with no agreement or request for information on the price a competitor would charge in the future. In contrast, we have parties in the instant case who met three or four times a year "to discuss the coal prices that would appear on the circulars" . . . and to "reach a tentative agreement concerning the prices to be charged by the companies. . . ." Memorandum, Findings of Fact and Verdict, p. 2.

### C. THE PRECEPTS ANNOUNCED BY THE TRIAL COURT AND THE SUPREME COURT

The trial judge, relying on *United States v. Patten,* 226 U.S. 525, 33 S.Ct. 141, 57 L.Ed. 333 (1912) and *United States v. Griffith,* 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1947), held:

There is no need to show any specific intent to restrain trade if a conspiracy to fix prices is shown to exist in an industry, the very nature of which involves large shipments of coal from the District in Pennsylvania to other states. See *U. S. v. Griffith,* 334 U.S. 100, 105[,] [68 S.Ct. 941,] 92 L.Ed. 1236, 1242 (1947); *U. S. v. Patten,* 226 U.S. 525, 543[,] [33 S.Ct. 141, 145,] 57 L.Ed. 333, 342 (1919). In the *Patten* case it was said:

---

**6.** On June 21, 1978, the trial judge filed his Memorandum finding Gillen guilty as charged.

The Supreme Court decided *Gypsum* on June 29, 1978.

" . . . [t]he conspirators must be held to have intended the necessary and direct consequences of their acts, and cannot be heard to say the contrary. In other words, by purposely engaging in a conspiracy which necessarily and directly produces the result which the statute is designed to prevent, they are, in legal contemplation, chargeable with intending that result."

"Proof that there was a conspiracy, that its purpose was to raise prices, and that it caused or contributed to a price rise is proof of the actual consummation or execution of a conspiracy under § 1 of the Sherman Act." *U. S. v. Socony-Vacuum Oil Co.*, 310 U.S. 150 [60 S.Ct. 811, at 842], 84 L.Ed. 1129 (1939) at 1166.

The above holding by the trial court stated the principles set forth in cases for more than four decades. Thus Judge Herman was merely following the traditional precepts long accepted in price-fixing cases, most notably in *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) which he explicitly cited.

Appellant contends that, regardless of the prior law, the trial judge erred because the Supreme Court in *Gypsum*, speaking through Chief Justice Burger, announced a different principle of law when it stated:

[A] defendant's state of mind or intent is an element of a criminal antitrust offense which must be established by evidence and inferences drawn therefrom and cannot be taken by the trier of fact through reliance on a legal presumption of wrongful intent from proof of an effect on prices.

98 S.Ct. at 2872.

Thus the ultimate issue is whether this language changed the long-established rule of law on price-fixing cases by requiring a more stringent burden of proof on the issue of intent.

Recognizing that the parameters of the conduct regulated by the Sherman Act may be at times elusive, we believe the Supreme Court's statement in *Gypsum* on intent was born out of a concern for borderline viola-

tions and was not meant to modify past precedent on price-fixing conspiracies, for the Court stated:

With certain exceptions for conduct regarded as *per se* illegal because of its unquestionably anticompetitive [side] effects, *see, e. g., United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129, the behavior proscribed by the Act is often difficult to distinguish from the gray zone of socially acceptable and economically justifiable business conduct. Indeed, the type of conduct charged in the indictment in this case—the exchange of price information among competitors—is illustrative in this regard. The imposition of criminal liability on a corporate official, or for that matter on a corporation directly, for engaging in such conduct which only *after the fact* is determined to violate the statute because of anticompetitive effects, without inquiring into the intent with which it was undertaken, holds out the distinct possibility of overdeterrence; salutary and procompetitive conduct lying close to the borderline of impermissible conduct might be shunned by businessmen who chose to be excessively cautious in the face of uncertainty regarding possible exposure to criminal punishment for even a good-faith error of judgment. (emphasis added)

*Id.* at 2875–76.

We submit that the Court did not intend any extraordinary change in the rules of law on price-fixing cases because by its very citation of *Socony-Vacuum* the court acknowledged that price-fixing cases are an exception. Moreover, price-fixing is clearly not "conduct which only *after the fact* is determined to violate the statute." *Id.*

Price-fixing is an area of the law in which people either can or ought to be able to predict the legal consequences of their actions. Price fixers do not even approach "the gray zone of socially acceptable and economically justifiable business conduct," 98 S.Ct. at 2875, for the Supreme Court nearly forty years ago created a bright-line prohibition by declaring:

Any combination which tampers with price structures is engaged in an unlawful activity. Even though the members of the price-fixing group were in no position to control the market, to the extent that they raised, lowered, or stabilized prices they would be directly interfering with the free play of market forces. The Act places all such schemes beyond the pale and protects that vital part of our economy against any degree of interference. Congress has not left with us the determination of whether or not particular price-fixing schemes are wise or unwise, healthy or destructive.

.     .     .     .     . .

Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se.

*United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 221, 223, 60 S.Ct. 811, 843–844, 84 L.Ed. 1129 (1940).

■ Thus in price-fixing conspiracies, where the conduct is illegal per se, no inquiry has to be made on the issue of intent beyond proof that one joined or formed the conspiracy. The conduct at issue in *Gypsum* concededly was of such a nature as to warrant a further inquiry into intent. The Supreme Court's concern with those who unwittingly violate antitrust laws has no place here. Here, defendants have fixed prices, "probably the clearest violation of the antitrust laws and the one most obnoxious to the underlying policy of free competition." [7] The act of agreeing to fix prices is in itself illegal; the criminal act is the agreement.

■ Moreover, even if read to apply here, *Gypsum* does not require a reversal because the intent requirements will always be met in a case involving a price-fixing conspiracy. If a defendant intends to fix prices, he necessarily intends to restrain trade. In *Gypsum,* the element lacking was a finding that the defendants knew that the exchanges of price information would have the probable effect of fixing or establishing prices. 98 S.Ct. at 2877. In defining the standard, the Court held that knowledge that the actions will result in restraining trade is enough. Here, where their actions were nothing less than price-fixing, the violators cannot be heard to argue that they did not know that their meetings and discussions of prices would result in an unreasonable restraint of trade.

■ Additionally, the mere existence of a price-fixing agreement establishes a defendant's illegal purpose. As the Court stated in *United States v. Trenton Potteries Co.,* 273 U.S. 392, 397, 47 S.Ct. 377, 379, 71 L.Ed. 700 (1926), "The aim and result of every price-fixing agreement, if effective, is the elimination of one form of competition." Thus, the conscious object of every price-fixing conspiracy is an illegal act.

Unlike *Gypsum* where the defendants allegedly did not appreciate the consequences of their actions, here the law is clear and the conduct egregious. The conspirators met and set prices. They did not engage in any subtle or sophisticated scheme; their actions were in no way ambiguous. We agree that fairness requires caution in presuming intent from a mere effect on prices where the defendant's actions might reasonably be considered not to violate the

---

7. *Mid-west Paper Products v. Continental Group, Inc.,* 596 F.2d 573[,] 597, (3d Cir. 1979) (Higginbotham, J., dissenting).

   The Supreme Court recently reemphasized:
   In construing and applying the Sherman Act's ban against contracts, conspiracies, and combinations in restraint of trade, the Court has held that certain agreements or practices are so "plainly anticompetitive," *National Society of Professional Engineers v. United States,* 435 U.S. 679, 692 [, 98 S.Ct. 1355, 55 L.Ed.2d 637] (1978); *Continental TV, Inc. v.*

   *GTE Sylvania Inc.,* 433 U.S. 36, 50 [, 97 S.Ct. 2549, 53 L.Ed.2d 568] (1977), and so often "lack   .   .   .   any redeeming virtue." *Northern Pac. R. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958), that they are conclusively presumed illegal without further examination under the rule of reason generally applied in Sherman Act cases.
   *Broadcast Music, Inc. v. CBS, Inc.,* —— U.S. ——, ——, 99 S.Ct. 1551, 1556, 60 L.Ed.2d 1, 9 (1979).

antitrust laws. But where, as here, individuals have fixed prices in a most unequivocal and flagrant manner, questions of knowledge of probable consequences and indeed of "conscious object" appear clearly answered.

### III.

### A.

On review, we must determine whether there is substantial supportive evidence for the district court's findings on the ultimate factual question of guilt. *United States v. Delerme*, 457 F.2d 156, 160 (3d Cir. 1972). With respect to the elements of the crime, the Supreme Court has held "that a corporate officer is subject to prosecution under § 1 of the Sherman Act whenever he knowingly participates in effecting the illegal contract, combination, or conspiracy—be he one who authorizes, orders, or helps perpetrate the crime." *United States v. Wise*, 370 U.S. 405, 416, 82 S.Ct. 1354, 1361, 8 L.Ed.2d 590 (1962). As a result, we must determine whether there is substantial evidence of knowing participation by Gillen in the price-fixing conspiracy. Our review of the evidence satisfies us that substantial supportive evidence of such knowing participation exists.

8. By Mr. Currier:

Q. From 1966 to the end of 1973, to your knowledge did Blue Coal ever issue a circular without your attending one of these meetings?

A. Not that I can recall.

Q. Did you inform anyone at Blue Coal about these price meetings?

A. Yes.

Q. Who was that?

A. Well, if Mr. Gillen was available, I spoke to him about it.

Q. When did you begin telling him of these meetings?

A. I would just have to assume sometime after he became President.

Q. For how long thereafter did you talk to him about these meetings?

A. Throughout 1973 whenever he was available I would talk to him about it.

Q. I didn't understand your answer, sir.

A. Throughout 1973 whenever he was available I would talk to him about it, yes.

Q. Did you speak to him in years prior to that about it?

First, it is undisputed that a price-fixing conspiracy existed. Second, we think that there is substantial evidence to support the district court's finding that Gillen knew of the conspiracy. Tomaine, sales representative for Blue Coal, reported to Gillen what occurred at the "after meetings" keeping Gillen abreast of coal pricing.[8] Tomaine testified that he informed Gillen that at the "after meetings" they had "agreed to go along on certain prices."[9]

Finally, with regard to Gillen's participation in the conspiracy, Joseph J. Fauzio, President of the Greenwood Stripping Company, and one of the unindicted co-conspirators, testified that:

Q. On the occasion of the Anthracite Committee meetings, Mr. Fauzio, do you recall any discussion on the occasion of such meetings either before, during or after with regard to the topic of price circulars?

A. The only discussion would be in a social atmosphere, whereas, someone would make the statement that it's about time that the boys get together and start thinking about the circular. This was done, to my knowledge, it had been mentioned by Mr. Tedesco, Mr. Ulmer, Mr. Gillen and myself.

A. Yes.

Q. What would you tell Mr. Gillen during these discussions?

A. The proposed price increase or decrease.

Transcript 379–380.

9. [By the Court]

Q. Did you ever explain to him that you were up there agreeing on prices?

A. I explained to him that we were up there discussing prices and what we were going to do for the coming circular whether there was an increase or decrease.

Q. You told them you were discussing prices?

A. And we agreed to go along on certain prices, yes, sir.

Q. And you told them that you were— these were the prices that you were going to charge at Blue Coal?

A. Yes, sir.

Transcript 468.

Q. What is the full name of Mr. Gillen that you are referring to?

A. Mr. Tom Gillen.

Transcript 41–42.

Additional evidence of direct involvement by Gillen is the testimony of several witnesses regarding a meeting in the winter of 1966–1967 at Brutico's Restaurant, Old Forge, Pennsylvania. The meeting was attended by owners, producers and sales representatives who agreed to re-establish price stability by attempting closer adherence to the circular price. Gillen was present and actively participated in criticizing the sales people for their price cutting activities.[10]

■ Furthermore, as president of the company, Gillen was in a position to order the price-fixing halted, but did not do so. When a company president has knowledge that his company is involved in a price-fixing conspiracy and takes no action to stop it, he may not insulate himself from liability by leaving the actual execution of the scheme to his subordinates. *See United States v. Wise*, 370 U.S. 405, 82 S.Ct. 1354, 8 L.Ed.2d 590 (1962). If this were not the rule, the highest corporate officers would, in effect, be beyond the reach of the antitrust laws even when their companies are actively engaged in price-fixing.

### B.

For the first time on appeal, Gillen pointed to an apparent ambiguity in the transcript with respect to testimony relied on by the Government in support of an affirmance:

Q. Did you ever explain to him that you were up there agreeing on prices?

A. I explained to him that we were up there discussing prices and what we were

going to do for the coming circular whether there was an increase or decrease.

Q. You told *them* you were discussing prices?

A. And we agreed to go along on certain prices, yes, sir.

Q. And you told *them* that you were—these were the prices that you were going to charge at Blue Coal?

A. Yes, sir.

Transcript 468 (emphasis added).

Defendant argues that the references to "them" make the testimony too vague and unclear to support a finding of knowledge of the conspiracy. Alternatively, counsel for Gillen urged at oral argument a remand to clear up the record on this point. We disagree. First, the trial judge in fact considered the matter during closing argument concluding that "It doesn't say to him but it's implied," and "I don't believe I said them, I was intending to say did you tell him."[11] It seems clear from the context, and Judge Herman so indicated, that the witness understood what was meant. Second, despite the discussion of this matter by the trial judge and government counsel, Gillen's trial counsel did not object to the trial judge's determination of the question and alluded to it only in passing in his brief on appeal. It is not this Court's practice to allow arguments of this nature to be raised on appeal if they were not pressed below. *See United States v. Dansker*, 537 F.2d 40, 64 (3d Cir. 1976).

### C.

■ Finally, we find Gillen's argument of withdrawal totally without merit. He argues that he began removing himself in 1972 from Blue Coal except for labor nego-

---

**10.** Gillen contended that this was merely a "social gathering" during which concerned coal executives met to advocate a stabilization of a depressed industry. The government characterized the meeting as a mechanism for shoring up deviations from the price stability promoted by the circular "after meetings." After having been exposed to these conflicting scenarios, Judge Herman was apparently persuaded that

the Brutico meeting was an indication that Gillen was a participant in the overall conspiracy. (*See* Appendix at 58; Memorandum Decision at 12). Several witnesses described the nature of the meeting and testified that Gillen attended.

**11.** Transcript of Proceedings on Argument at 8–11.

tiations and his efforts to sell the company. From this he argues that the government was required to prove his continuous participation in the conspiracy by introducing evidence of continued overt acts. The burden is, however, on the defendant to prove "[a]ffirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators." *United States v. United States Gypsum Co.,* 98 S.Ct. at 2887; *United States v. Heckman,* 479 F.2d 726, 729 (3d Cir. 1973). In addition, Tomaine testified that he continued to inform Gillen of the price-fixing meetings until the business was sold in late 1973.[12]

For these reasons, the judgment of sentence will be affirmed.

ADAMS, Circuit Judge concurring.

I concur in the judgment of the Court and join in parts I and III of the majority's opinion. However, because the discussion by the majority regarding the issue whether intent must be shown in a price-fixing case diverges from my understanding of the present state of the law on this important subject, I have undertaken a separate statement.

Specifically, the majority appears to adhere to the position that intent is not a necessary element in establishing a price-fixing violation under § 1 of the Sherman Act. Rather, the majority asserts that "the Supreme Court's statement in [*United States v. United States Gypsum Co.* [438 U.S. 422] 98 S.Ct. 2864 [57 L.Ed.2d 854] (1978)] on intent was born out of a concern for borderline violations and was not meant to modify past precedent on price-fixing conspiracies."[1] In my view, this stance cannot be squared with the explicit conclusion arrived at in *Gypsum:* "The criminal

offenses defined by the Sherman Act should be construed as including intent as an element."[2] This conclusion by the Supreme Court was specifically grounded on its "unwilling[ness] to construe the Sherman Act as mandating a regime of strict liability criminal offenses."[3]

Accordingly, whereas under the majority's approach a defendant who is prosecuted for participating in a price-fixing conspiracy or in any other combination that constitutes a *per se* violation of the Act would not be entitled to a jury charge on intent, I regard such an instruction, when requested, to be mandatory after *Gypsum.* However, in Gillen's case it appears that the failure of the trial judge—who sat without a jury and operated without the benefit of the *Gypsum* pronouncement—to make an explicit determination regarding intent did "not affect the substantial rights of" Gillen.[4] Therefore, I join the majority in its affirmance of the judgment of the district court.

As I understand the *Gypsum* opinion, it instructs that whether the criminal offense charged under section 1 of the Sherman Act is a *per se* violation or whether at the other end of the spectrum it approaches "the gray zone of socially acceptable and economically justifiable business conduct,"[5] the government must meet its burden of establishing intent. *Gypsum* declares that the prosecution may meet this responsibility under one of two standards. If a defendant is charged with engaging in illegal conduct the anticompetitive effects of which did not come to fruition, *Gypsum* directs that an "elevated standard of intent" must be satisfied before criminal liability may be imposed—namely, that the defendant had the specific intent or conscious purpose to produce the anticompetitive consequences.[6]

---

**12.** Transcript, *supra,* note 8.

**1.** Supra at 544.

**2.** 98 S.Ct. at 2876 (footnote omitted).

**3.** *Id.* at 2872–73 (footnote omitted).

**4.** *See* 28 U.S.C. § 2111 (harmless error rule). Also, inasmuch as no plain error was committed by the district judge, reversal would not

appear to be warranted since no request was made at trial for a determination regarding intent. *See* note 22 and accompanying text *infra.*

**5.** 98 S.Ct. at 2875.

**6.** *Id.* at 2877 n.21.

On the other hand, if anticompetitive effects actually resulted from the defendant's actions, the government need prove only that the defendant had knowledge of the probable consequences of his acts.[7] Moreover, in establishing knowledge, the government, under the guidelines set forth in *Gypsum,* may not rely on a presumption that a defendant intends the necessary and direct consequences of his acts, although an anticompetitive effect "may well support an inference that the defendant had knowledge of the probability of such a consequence at the time he acted."[8]

In sum, the Supreme Court held in *Gypsum* "that a defendant's state of mind or intent is an element of a criminal antitrust offense which must be established by evidence and inferences drawn therefrom and cannot be taken from the trier of fact through reliance on a legal presumption of wrongful intent from proof of an effect on prices."[9] Contrary to the majority's reading of *Gypsum,* these two aspects of the holding appear to have clarified an unsettled area of law and to have overruled prior precedent that had developed in the wake of *United States v. Patten,* 226 U.S. 525, 33 S.Ct. 141, 57 L.Ed. 333 (1913). The Supreme Court stated in that early case, which reversed the dismissal of a criminal indictment:

> And that there is no allegation of a specific intent to restrain such trade or commerce does not make against this conclusion (sic), for, as is shown by prior decisions of this court, the conspirators must be held to have intended the necessary and direct consequences of their acts and cannot be heard to say the contrary. In other words, by purposely engaging in a conspiracy which necessarily and directly

produces the result which the statute is designed to prevent, they are, in legal contemplation, chargeable with intending that result.[10]

*Patten* had been regarded, first, as negating a requirement of specific intent in criminal antitrust cases.[11] Indeed, it had been thought, as the district court's jury charge in *Gypsum* attests, that no intent whatsoever need be established in criminal antitrust cases when it is shown that the defendant's conduct had anticompetitive effects.[12] *Patten* has also been cited for the proposition that it may be conclusively presumed that a defendant intends the necessary and direct consequences of his acts.[13] Neither of these interpretations of *Patten* would appear to survive *Gypsum* intact. The first—that proof of specific intent is not required—now applies only to cases where anticompetitive effects have been demonstrated. The second—that a defendant may be conclusively presumed to intend the necessary consequences of his acts—has been discarded altogether.[14]

Turning to the present case, it appears that there was no need for the prosecution to establish that Gillen had a conscious purpose to achieve anticompetitive results—the level of intent required in cases where anticompetitive effects cannot be shown. Rather, it was sufficient for the government to demonstrate that Gillen knew that the price-fixing conspiracy would produce such effects. This is so because the district court found that Gillen and the other parties named in the indictment knowingly entered into a conspiracy to fix prices, whereby the prices contained in the corporate defendants' price lists during the years 1966–73 were set by agreement among com-

---

7. *Id.*

8. *Id.* 98 S.Ct. at 2878.

9. *Id.* 98 S.Ct. at 2872.

10. 226 U.S. at 543, 33 S.Ct. at 145.

11. *See, e. g., United States v. Champion Int'l Corp.,* 557 F.2d 1270, 1274 (9th Cir.), *cert. denied,* 434 U.S. 938, 98 S.Ct. 428, 54 L.Ed.2d 298 (1977).

12. *See Gypsum, supra,* 98 S.Ct. at 2872.

13. *See, e. g., United States v. Hilton Hotels Corp.,* 467 F.2d 1000, 1002 (9th Cir. 1972), *cert. denied,* 409 U.S. 1125, 93 S.Ct. 938, 35 L.Ed.2d 256 (1973).

14. *See* Handler, *Antitrust—1978,* 78 Colum.L. Rev. 1363, 1399 (1978).

petitors.[15] Such a price-fixing arrangement is a *per se* violation of the Sherman Act, which means that there necessarily are anticompetitive effects, since the *per se* characterization is reserved for those combinations "which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable."[16] And, inasmuch as an ongoing price-fixing scheme spanning at least seven years was found to exist rather than an incipient conspiracy that had not yet borne fruit, it cannot be said that the anticompetitive effects "did not [yet] come to pass" so as to necessitate the establishment by the government of the "elevated standard of intent."[17]

The Supreme Court has narrowly circumscribed the situations in which a fact-finder may reasonably conclude that a defendant lacked the requisite knowledge to support criminal liability for violating section 1 of the Sherman Act. Under the Court's teaching in *Gypsum*, all that is demanded for purposes of satisfying the knowledge requirement is that the defendant have a rudimentary awareness of economic cause and effect, and therefore "that the defendant had knowledge of the probability of . . . [the anticompetitive] consequence

at the time he acted."[18] Thus the government need not prove that the defendant knew that the effects of the conduct or the conduct itself were proscribed, since mistake or ignorance of the law is no defense.[19] Nor is it generally essential under this lesser intent standard that the prosecution prove that the defendant engaged in the illegal conduct with an improper purpose in mind.[20]

Where, as here, the conspirators have been found to have met systematically and periodically for at least seven years to fix prices, it is implausible that they did not know that they were tampering with the supply and demand curve of the competitive market. To paraphrase the Supreme Court, "[t]he business behavior which [gave] rise to criminal antitrust charges [here] is conscious behavior normally undertaken only after full consideration of the costs, benefits and risks."[21] Accordingly, I cannot say on the record before us that the omission by the trial judge of a specific finding that the defendants knew that their conduct would produce anticompetitive results affected the substantial rights of Gillen so as to warrant a reversal, particularly where such a finding was not requested.[22]

15. *See United States v. Gillen*, 458 F.Supp. 887, 890 – 892 (M.D.Pa., 1978) (memorandum).

16. *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

17. *See Gypsum, supra*, 98 S.Ct. at 2877 n.21.

18. 98 S.Ct. at 2878.

19. *See The Supreme Court, 1977 Term*, 92 Harv.L.Rev. 1, 297–98 (1978).

20. *See* 98 S.Ct. at 2879 n.23.

21. *Gypsum, supra*, 98 S.Ct. at 2878. In this respect, the conduct involved here is to be distinguished from the exchange of price information that marked *Gypsum*, where it may well be doubted whether the defendants knew that anticompetitive consequences could be expected to flow from their activity. *See id.* at 2875 & n.16. *See also* Handler, *supra* note 14, at 1399–1400.

22. *See* note 4 *supra*. Gillen's defense, which was predicated in large measure on the asser-

tion that he had no knowledge of, and never authorized or ratified the price-fixing agreements entered into by Tomaine, his company's sales representative, addressed the different question whether Gillen knowingly joined the conspiracy. As the Supreme Court explained in *Gypsum*, "[i]n a conspiracy, two different types of intent are generally required—the basic intent to agree, which is necessary to establish the existence of the conspiracy, and the more traditional intent to effectuate the object of the conspiracy. *See* LaFave and Scott, Criminal Law 464–465 (1972). Our discussion here focuses only on the second type of intent." 98 S.Ct. at 2876 n.20. With respect to the first type of intent—whether the defendants in this case intended to agree upon a conspiratorial course of conduct, the district court determined both that a conspiracy was knowingly formed and that Gillen was a knowing participant. The trial judge also held that there was no need for the government to prove specific intent to restrain trade, a holding that properly reflects the law even after *Gypsum*. 458 F.Supp. at 893–894.

Therefore, I concur in the judgment of the Court.